THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* SVEND O. SANDGREN, Respondent.

Argued January 9, 1951; decided April 12, 1951.

*George B. De Luca*, District Attorney (*George Tilzer* and *Herman J. Fliederblum* of counsel), for appellant. I. The People proved beyond a reasonable doubt that decedent took all the precautions which the circumstances permitted to avoid defendant's dogs. (*People* v. *Brasch*, 193 N. Y. 46; *Braun* v. *Buffalo Gen. Elec. Co.*, 200 N. Y. 484; *Schafer* v. *Mayor of City of N. Y.*, 154 N. Y. 466; *Noble* v. *New York Central & H. R. R. R. Co.*, 20 App. Div. 40, 161 N. Y. 620.) II. A person cannot be expected to avoid that which he does not know to exist. III. The sufficiency of circumstantial evidence is not to be determined by each individual circumstance, but rather by the circumstances taken as a whole. (*People* v. *Gillette*, 191 N. Y. 107.)

*Philip Segal* and *Samuel Segal* for respondent. There were no facts or circumstances known or proved sufficient to support the findings, beyond a reasonable doubt, that decedent had taken all the precautions which the circumstances permitted to avoid the animals. (*People* v. *Kennedy*, 32 N. Y. 141; *People* v. *May*, 290 N. Y. 369; *People* v. *Friedman*, 302 N. Y. 75.)

CONWAY, J. This is an appeal by permission of a Justice of the Appellate Division from an order reversing a judgment of the County Court of Bronx County convicting the defendant of the crime of manslaughter in the second degree upon the verdict of a jury and dismissing the indictment upon the law.

The count of the indictment charging manslaughter reads as follows: " The said defendant, on the 1st day of July,

1947, in the Borough and County of Bronx, in the City of New York, being then and there the owner of mischievous animals, to wit, dogs, and then and there knowing their propensities, wilfully and unlawfully did suffer them to go at large and did keep said animals without ordinary care, and the said animals, while so at large, and not confined, did kill a human being, to wit, one Stanley Balaban, a male child of the age of eleven years, he, the said Stanley Balaban, having taken all the precautions which the circumstances permitted, to avoid said animals, in that, the said defendant, did keep said animals without ordinary care and did wilfully suffer them to go at large, and while so at large, and not confined, said animals did then and there bite, gnaw, chew, rip, tear, bruise and wound the said Stanley Balaban, thereby giving unto him, the said Stanley Balaban, divers mortal wounds and bruises, of which said mortal wounds and bruises, he, the said Stanley Balaban, at the Borough and County of Bronx aforesaid, from the said 1st day of July 1947, did languish and languishing did live, and on the said 1st day of July 1947, he, the said Stanley Balaban, at the Borough and County of Bronx aforesaid, of the said mortal wounds and bruises, did die.''

The section of the Penal Law under which such indictment was drawn is section 1052, which reads in part as follows:

'' § 1052. *Manslaughter in second degree defined.*

'' Such homicide is manslaughter in the second degree, when committed without a design to effect death:

'' 1. By a person committing or attempting to commit a trespass, or other invasion of a private right, either of the person killed, or of another, not amounting to a crime; or,

''.2. In the heat of passion, but not by a dangerous weapon or by the use of means either cruel or unusual; or,

'' 3. By any act, procurement or culpable negligence of any person, which, according to the provisions of this article, does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree.

'' Woman producing miscarriage. * * *

'' Negligent use of machinery. * * *

'' Mischievous animals. — If the owner of a mischievous animal, knowing its propensities, wilfully suffers it to go at

large, or keeps it without ordinary care, and the animal, while so at large, and not confined, kills a human being, who has taken all the precautions, which the circumstances permitted, to avoid the animal, the owner is guilty of manslaughter in the second degree.

" Overloading passenger vessel. * * *

" Persons in charge of steamboats. * * *

" Persons in charge of steam engines. * * *

" Acts of physicians while intoxicated. * * *

" Persons making or keeping gunpowder contrary to law. * * * "

The Appellate Division in reversing the judgment of conviction and dismissing the indictment did so upon the ground that there was no proof that the deceased boy had taken all the precautions which the circumstances permitted to avoid the animals. (277 App. Div. 217, 221–222.)

The only question before us on this appeal is whether the People made out a prima facie case. It is the law of this State that when the People establish that a defendant has caused the death of a human being as a result of his responsible action or inaction so as to bring it within one of the statutory definitions of punishable homicide, a prima facie case is made out and the People are entitled to go to the jury without more. Whether such homicide is justifiable or excusable has always been a matter of defense and the burden of going forward with evidence to show justifiableness or excusability or guilt of a lesser degree of the crime proved prima facie, shifts to the defendant. Whether or not the defendant avails himself of his right to go forward with evidence, the over-all burden of establishing the guilt of the defendant beyond a reasonable doubt never shifts from the People who must bring the case within one of the statutory definitions of one of the divisions of punishable homicide. (*People* v. *Riordan,* 117 N. Y. 71; *People* v. *Downs,* 123 N. Y. 558, 564; *People* v. *Stern,* 201 App. Div. 687, appeal dismissed 237 N. Y. 514.) The issue before us then on this record and appeal is whether there are sufficient facts to support the finding, implicit in the jury's verdict after hearing both sides, that the deceased had taken all the precautions which the circumstances permitted to avoid the animals.

If there be such supporting facts, the Appellate Division was not warranted in dismissing the indictment.

It is not necessary for the purpose of this opinion to detail all of the distressing facts as to the manner in which the Balaban boy came to his death except insofar as they may be applicable to the law questions posed. Suffice it to say, that when the attention of a patrolman was called to the body of the deceased as it lay upon the street by some boys who had discovered it as it lay face downward and who could see six bull terriers chewing upon it, the patrolman started forward with his nightstick in his hand. He reached the body after having been attacked by one of the dogs and having beaten it off. His testimony then was as follows:

" Well, as I was saying, when I bent over to investigate the body, two dogs came at me. I swung at one with my nightstick. I struck him. The other one bit me as I indicated before here (indicating). I took my stick and I clubbed him off, this one on the thigh. With that all the other dogs joined the dog. They all came at me. I swung at them again and again. Every time I hit them they would just come right back again. The next thing, you know, one of them struck me under here or bit me right under here (indicating).

" Q. You are indicating a point about three inches underneath the right armpit? A. Yes.

" Q. Is that approximately correct? A. About here (indicating).

" Q. Yes? A. Now, with that my hand got weak, just opened up and my nightstick fell out of it. With that I went down. As I went down I grabbed my throat with my left hand and I tried to get my gun out with my right hand. I was leaning over on the side this way (indicating) and I could see an arm with a blue shirt, a blue arm with a gun in its hand. A shot was fired. * * * With that shot the dogs relinquished their attack. They gave me a chance to scramble up towards this arm which turned out to be Sergeant Werner of the 43rd Precinct. * * * "

The medical examiner testfied that he found many wounds upon the body of the deceased — too many to be counted. He found " crescentic patterns and puncture wounds " caused by dogs' teeth. Among the many major wounds — all of which

were caused by the dogs — the doctor stated that he found the left armpit gouged out, leaving the left axillary artery and vein severed and that the third cervical vertebra of the neck had been fractured. These wounds, together with multiple lacerations and tears of the body, were given as the cause of death.

The trial court charged — without exception or request to charge — that the People were required to establish, to the same degree of certainty as all the other elements of the crime, that the Balaban boy took all the precautions " which the circumstances permitted to avoid the animal[s]." There was no evidence that the deceased knew or should have known that there were dogs in the area or that the dogs were mischievous or vicious. There were no signs warning pedestrians or passersby of their presence or of their propensities. In addition, the deceased was not a trespasser, having every right to be upon a public street. It is common knowledge that dogs generally are not mischievous or vicious animals; that regardless of size and breed they are accepted and known as the friend and companion of man and especially of boys. (See *Kennet* v. *Sossnitz*, 260 App. Div. 759, 761, affd. 286 N. Y. 623; *Patton* v. *State*, 93 Ga. 111; *Crowley* v. *Groonell*, 73 Vt. 45, 47.) Under those circumstances the Balaban boy had no duty whatever to " avoid " the dogs. Certainly the Legislature never intended, as the majority opinion in the Appellate Division recognizes, that all persons must flee from dogs or other domestic animals on sight, or that the deceased in this particular case was to avoid under all circumstances the defendant's dogs whose mischievousness and viciousness he did not know existed. He was under obligation to avoid them when and if he learned of their mischievous propensities and only then.

In addition, there was no evidence to show that the deceased annoyed the dogs or provoked their attack upon him. His body was found alone, some fifty feet from the houseboat on which the defendant lived with eight bull terriers, clad only in khaki trunks, without weapon of any kind. There was no evidence to show that he had been near the houseboat, nor was there evidence of entry into it, nor of any blood near it. The lock on the houseboat door had not been interfered with and there was no indication that anyone had touched the window, the top of which was covered with dust.

On the other hand, turning our attention to what the defendant knew, there was an abundance of evidence that these dogs attacked other persons without any provocation. Thus, one Giunta, a thirteen-year-old boy, was bitten by one of the dogs on May 9, 1946, while playing outside a public school where the defendant worked as custodian. " Nellie ", who was on the front seat of defendant's car, stuck her head through the open window about four or five inches and bit Giunta on the upper arm. The dog so ripped his coat that one part of it remained in the car. Giunta testified that he did not molest or provoke the dog or put his hand into defendant's car. He was treated by a physician and exhibited the wound on his arm at the time of trial. As a result of the attack the defendant gave the boy's mother $25 to cover the doctor's bill and the cost of the coat.

On August 27, 1946, one Keane and one Haynes, fourteen and fifteen years old, respectively, while attempting to " sneak " into the Castle Hill Pool, a commercial amusement place, through a hole in the fence near the defendant's houseboat, were bitten in an unprovoked attack by " Nellie " and " Iron Duke ". Keane was bitten on the right buttocks and Haynes on the left leg. The wound on Haynes' leg was still visible at the time of trial. Haynes testified that they had seen the dogs running loose " nearly all the time we went " to the pool, and the Keane boy stated that the houseboat was open on occasion.

On September 29, 1946, a Mrs. Royston, while attending a dog show at the Westbury Kennel Club, was bitten on the leg by " Nellie ". The attack was unprovoked and the wound was of such severity it remained open for two months. Doctor Shindell, a veterinarian, as a result of this attack, went, on the following day, to the defendant's houseboat for the purpose of examining the dogs to see if they had rabies. He approached the boat, and seeing no sign of life, called out defendant's name. In response he received a " chorus of dog barks " and with that a dog came running down the gangplank towards him. Knowing that he was in danger and pretending to show no fear, the doctor backed up slowly. After the dog went back to the houseboat, the doctor turned and " ran as fast as I could for my car." The doctor stated that in this instance when the dog came close to him, it crouched low and stalked

and that ordinarily a house dog " will bark, or if it is a small dog he will snap at your heels, but they will not stalk and crouch and go for you. No house dog I have seen will do that." In addition, according to the expert testimony of this witness, one of the worst things one could do to " avoid " a vicious dog would have been to turn one's back and run. Certainly that would have been a natural form of avoidance by the Balaban boy. Dr. Shindell had had thirty-two years' experience in handling dogs, part of which time he had spent in the Army handling " defense dogs ". Other witnesses, called by defendant, gave it as their expert testimony that a vicious dog was one who would bite without provocation.

One Cohan, a correction officer in the department of correction, whose home was two blocks from the houseboat, testified to being annoyed by the defendant's dogs in June, 1946, while he was walking along one of the streets in the neighborhood in the company of two of his married neighbors. Later in the following September, after seeing several white bull terriers running loose, he went to defendant's home to complain. Seeing one of the dogs, he called out. This is his testimony as to what followed:

" * * * Then suddenly a mess of dogs poured out of an open doorway on the houseboat and down the gangway heading for us with teeth bared, lips drawn back and snapping and, well, charging at us, attacking us at a terrific pace and, well, we were just cornered practically. Well, I looked around and luckily I found a cudgel next to me, a stout mahogany piano leg or table leg, I don't remember which now, I picked it up and started warding them off, and they would come up there closer and closer and I knew that I would have to wait until they were almost upon me to make sure that I got them good so that they wouldn't get me. * * *

" And as they got close to me, snapping and growling and coming towards me, I swung at them with the club that I had picked up and, well, I don't know how long that went on, but in the meantime as I was swinging at them I fought my way back towards the car, and Mr. Risbano was beside me and we got into the car and shut the door and stood there for a couple of minutes; just stood there recuperating."

All these repeated and ferocious attacks were made without any provocation whatever. Defendant knew of all those episodes. He so testified. In fact, he admitted on the witness stand that on twenty different occasions he brought his dogs to be examined at the department of health as a result of ten separate complaints that his dogs had bitten human beings.

It may be well to point out here that the Legislature has made a very strict rule in section 1052 of the Penal Law as to persons who have mischievous animals when they know them to have mischievous propensities. If such a person (a) wilfully suffers it to go at large or (b) keeps it without ordinary care, and the animal while so at large kills a human being, the owner is guilty of manslaughter. The Legislature did not provide that the animal had to be vicious or ferocious nor did the Legislature say that the owner had to be culpably negligent in keeping it so that it became at large. Yet in the same section in subdivision 3, the Legislature provided that manslaughter would be committed by one, under the circumstances there declared, who was guilty of any act, procurement or culpable negligence. The Legislature thus had in mind, in this same section, negligence which was culpable and negligence which flowed from lack of ordinary care and provided that when one kept a mischievous animal, knowing its propensities, and the animal went at large by lack of ordinary care and death ensued, the owner who failed to exercise such ordinary care was guilty of manslaughter. When we seek to determine whether or not ordinary care has been exercised the test is the foreseeability of the risk. (*Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339, 344–345; *O'Neill* v. *City of Port Jervis,* 253 N. Y. 423, 434; *Kennet* v. *Sossnitz,* 260 App. Div. 759, 763–764, *supra.*) The reason for this legislative action no doubt is historical. In civil cases it has always been the rule that the liability of an owner of a ferocious animal, whether *ferae naturae* or *domitae* (see 28 C. J. S., p. 52) which attaches for injury done to a third person, is *absolute* where such animal is kept with the owner's knowledge of its ferocious propensities, and it is not shown that the person injured voluntarily or consciously did anything to bring about the injury. *Muller* v. *McKesson* (73 N. Y. 195, 199–202) and *Molloy* v. *Starin* (191 N. Y. 21, 24–25) each of which cites and collates many cases and authorities; see, also, *Yackel* v. *Nys*

(258 App. Div. 318); *Crowley* v. *Groonell* (73 Vt. 45, 47, *supra*). In the *Molloy* case (*supra*) at pages 24–25, we said: "It is, probably, the fact, regarding the various instructions to the jurors, that the trial court applied the strict rule of liability, adopted in cases where ferocious animals, whether *ferae naturae,* or *domitae,* are kept, with the owner's knowledge of their ferocious propensities. In such cases, no distinction seems to be made between the two classes of animals, (Addison on Torts, 22, 230, 4th Eng. ed.), and the liability, which attaches for any injury done, is absolute; unless it can be shown that the person injured voluntarily, or consciously, did something to bring about the injury."

The gravamen of the crime in the case at bar is the killing of a human being by mischievous animals which were kept without ordinary care by their owner who knew of their propensities. It must be remembered that one of the foundation stones of organized society — of civilization — is the safeguarding and preservation of human life. The evil which this particular statute aims to prevent is the killing of a human being by a mischievous animal. This evil, we may note, has not only been known to man for countless centuries but is one which he long ago recognized and sought to prevent. *

No doubt the law in civil cases led the Legislature in cases of homicide to use the words "mischievous animals" and "ordinary care". The word mischievous, since it is not as strong as the words vicious and ferocious, indicates again the severity of the rule laid down by the Legislature in section 1052. The word mischievous has a definite meaning in the cases. Thus in *Evans* v. *McDermott* (49 N. J. L. 163, 164–165, 166) it was said:

"An action can be maintained against the owner by a party injured, upon evidence that a dog, with the knowledge of the owner, had a *mischievous propensity* to bite mankind, whether

---

* Old Testament, Exodus, chapter 21, verses 28, 29: "If an ox gore a man or a woman that they die: then the ox shall be surely stoned, and his flesh shall not be eaten but the owner shall be quit.

"But if the ox were wont to push with his horn in time past, and it hath been testified to his owner, and he hath not kept him in, but that he hath killed a man or a woman; the ox shall be stoned, and his owner also shall be put to death."

in anger or not. In either case, the person bitten would suffer injury. A mischievous propensity is a propensity from which injury is the natural result." (Emphasis in original.)

" The conclusion is that the plaintiff below, having shown by his proof that on several previous occasions the dog in question had bitten various persons on the hand, with the knowledge of the defendant, he was entitled to recover, even if the habit did not proceed from a ferocious nature, but was the result of a mischievous propensity." (See, also, *Crowley* v. *Groonell*, 73 Vt. 45, *supra*; *Dranow* v. *Kolmar*, 92 N. J. L. 114; *Liberman* v. *Drill*, 94 N. J. L. 387.)

There was no evidence in this case that the boy had ever been in that area before or that he knew of the presence of these dogs or of their propensities or the danger. There were no signs warning of their presence. Giving the word " avoid " its common and ordinary meaning, it is obvious that the Legislature did not intend, and indeed could not have intended, that the deceased was required to avoid a danger which he did not know existed. The jury considered the circumstances, on the question of the deceased's conduct when he came into contact with the dogs, as they were required by the charge to do. Taken as a whole, the evidence established a factual pattern from which the jury could conclude that this young, obese, unarmed, shoeless and unclad eleven-year-old boy, ignorant of the propensities of the dogs, was attacked with such suddenness that he, a child, was overcome with terror and fright and fell helpless where his body was found.

Since the distinction between exceptions and provisos in statutes and the effect, upon the order of proof in an action, of the rule requiring the negativing of exceptions but not of provisos, was not urged in the trial court or argued before us, we do not consider or pass upon it. (See *People* v. *Devinny*, 227 N. Y. 397; *Harris* v. *White*, 81 N. Y. 532; *Rowell* v. *Janvrin*, 151 N. Y. 60; *People* v. *Stedeker*, 175 N. Y. 57; *People* v. *Bradford*, 227 N. Y. 45; *Fleming* v. *People*, 27 N. Y. 329; *United States* v. *Cook*, 17 Wall. [U. S.] 168; *Shelp* v. *United States*, 81 F. 694; *Evans* v. *United States*, 153 U. S. 584; *Ex Parte Hornef*, 154 Cal. 355; *State* v. *Connor*, 142 N. C. 700; *State* v. *Abbey*, 29 Vt. 60.)

The order of the Appellate Division dismissing the indictment on the law should be reversed and the case remitted to that court for decision upon the facts. (See Code Crim Pro., § 543-a.)

LOUGHRAN, Ch. J., LEWIS, DESMOND, DYE, FULD and FROESSEL, JJ., concur.

Order reversed, etc.