[No. H006844. Sixth Dist., Dec. 11, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL PATRICK BERRY, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II-C, IV, V and VI.

**COUNSEL**

Jeffrey M. Evans for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sygiyama, Assisant Attorney General, David Lew and Jeff Bryant, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### CAPACCIOLI, Acting P. J.—

#### Statement of the Case

This case involves the killing of a small child by Willy, a pit bull owned by defendant Michael Patrick Berry. Defendant appeals from a judgment entered after a jury found him guilty of involuntary manslaughter, keeping a mischievous animal, keeping a fighting dog, and cultivating marijuana. (Pen. Code, §§ 192, subd. (b), 399, and 597.5, subd. (a)(1) and Health & Saf. Code, § 11358.)[1] He claims the trial court erred in instructing the jury on involuntary manslaughter and keeping a mischievous animal. He further claims that as a matter of law he may not be held criminally liable for the child's death and that the evidence is insufficient to support his convictions for involuntary manslaughter, keeping a mischievous dog, and keeping a fighting dog. He also claims the court abused its discretion in admitting autopsy pictures of victim.

We affirm the judgment.

#### Statement of Facts

James Soto, the victim, lived with his parents Yvonne Nunez and Arthur Soto and three siblings in a house located behind defendant's on Wright Avenue in Morgan Hill. The two houses were close to each other and shared a common driveway.

Defendant, who was interested and involved in dog fighting, owned three pit bulls, Blondie, Pee Wee, and Willy. Willy was bred for gameness and wind and had a hard bite. Defendant specially trained Willy on a treadmill to condition him. Defendant told Richard Soto, Arthur Soto's brother, he would not fight Willy for under $500. He also warned him that Willy was "vicious and dangerous" and if he got loose he could "do a job" on certain people. He said he had a wedge to pry Willy's mouth open if he needed to.

Defendant informed Nunez that his dogs would not hurt her children. However, she understood him to mean that they should stay away from Willy.

Sometime before June 13, 1987, defendant moved Willy and his dog house into a corridor between the west side of his house and a shed. Willy

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

was restrained by a six-foot chain, but there was unimpeded access to the corridor and Willy from the lawn on the south (Wright Street) side of defendant's house. Behind Willy, farther down the corridor, defendant kept a marijuana patch. At the time of the fatal incident, defendant had over 200 baby plants.

On the afternoon of June 13, 1987, Yvonne Nunez put the victim, who was then two years and eight months old, in a fenced patio on the driveway side of the house. The fence had two gates. Nunez then went inside to attend the victim's brother for a short time. While she was not looking, the victim wandered out of the patio, down the driveway, and out onto the sidewalk in front of defendant's house. Defendant and his housemate Tommy Espinoza were inside and saw him through their screen door. The victim walked over to Carmen Martinez's house next door to defendant's. Martinez, who was watering her lawn, saw him. He babbled something to her and then walked back to defendant's house. A short time later, Martinez heard him babbling on the other side of the fence that separates her house from defendant's.

Meanwhile, Nunez looked back to the patio for the victim and discovered he was gone. She went outside and with Arthur Soto began searching for him. Soto went to defendant's house and learned that the victim had just been on defendant's porch. Soto started back home but thought the victim might have gone to defendant's shed. As he approached it, he saw Willy mauling the victim. He called for defendant, who came out, picked up the victim, and moved several feet away. The next day, the victim died.

### The Defense

The defense claimed that this case was, in essence, a witch hunt against pit bulls, that prosecution witnesses tailored their testimony and were biased and not credible, and that the prosecution failed to satisfy its burden of proving guilt beyond a reasonable doubt.

The defense argued that the victim's death was an accident, an absolute misfortune, and thus not an unlawful killing. It suggested that to a degree the victim and/or his parents may have played a part. It argued that Willy was not a guard or fighting dog and was harmless to humans and playful with children. It argued that defendant neither knew nor reasonably should have known that Willy had dangerous propensities, could not have foreseen that Willy might harm another person, and kept Willy in a reasonable and prudent manner.

*Discussion*

## I. *Instructional Error re Involuntary Manslaughter**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. *Instructional Error re Section 399*[6]

### A. *Instruction That Minor Need Not Take Precautions*

■   Defendant contends the trial court erred when, over his objection, it instructed the jury that "A minor under the age of five years is, as a matter of law, not required to take any precautions which the circumstances permitted, nor which a reasonable person would ordinarily take in the same situation." He argues that this instruction directed a verdict on an element of the offense and thereby relieved the prosecution of its burden of proof. He further claims the error compels reversal. We disagree.

■   In understanding the meaning and scope of a criminal statute, we are guided by the evil the Legislature sought to avert and the method chosen to do so. (*People* v. *Carroll* (1970) 1 Cal.3d 581, 584 [83 Cal.Rptr. 176, 463 P.2d 400]; see 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 22, pp. 28-29 and cases cited there.)

■   The basic purpose of section 399 is to protect people against fatal attacks by "mischievous animals," where the victim is in no way at fault for the attack. (Cf. *People* v. *Sandgren* (1951) 302 N.Y. 331 [98 N.E.2d 460, 465 [explaining similar statute].) It does so by punishing those who know their animals are "mischievous" but allow them to run free or keep them in a negligent manner.

With the statute's purpose in mind, we examine the language that implicitly excuses a defendant's otherwise culpable conduct if *the victim* is partially at fault for the attack, that is, if the victim has not "taken all the precautions which the circumstances permitted, or which a reasonable person would ordinarily take in the same situation[.]" (§ 399.)

It is unreasonable to conclude that this language limits the scope of statutory protection to those who possess the physical and mental capacity to

---

*See footnote, *ante*, page 778.

[6]Section 399 provides, in relevant part, "If the owner of a mischievous animal, knowing its propensities . . . keeps it without ordinary care, and such animal . . . , while not kept with ordinary care, kills any human being who has taken all the precautions which the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony."

take precautions to prevent an attack and actually take the steps reasonably available to avoid (or not provoke) it. Rather, in light of the evil to be averted, this language must be read to protect those who lack the capacity to take the precautions that were available and could have been taken, but who in fact took none.

To realize this protection, we hold that where the prosecution proves beyond a reasonable doubt that the victim lacked the *capacity* to take the precautions reasonably available, it need not specifically prove that the victim did in fact take any or all such reasonable precautions and the jury need not be instructed to so find.

Our holding renders the statute "reasonable, fair and harmonious with its manifest purpose" (*People* v. *Butler* (1980) 104 Cal.App.3d 868, 883 [162 Cal.Rptr. 913]) and avoids absurd consequences that could flow from a slavish adherence to the literal language of the statute. (Cf. *In re O'Neil* (1977) 74 Cal.App.3d 120, 123 [141 Cal.Rptr. 338] [courts should avoid constructions that lead to absurd consequences].) Thus, for instance, where the victim is incapable of taking precautions and took none, our holding eliminates the need for the jury to make a confusing and purely fictional finding that he or she actually took all precautions the circumstances, including his or her incapacity/incompetence, reasonably permitted or that a reasonable but incapable person would have taken.

Requiring a finding of incapacity beyond a reasonable doubt also pre-serves the prosecution's obligation to prove that fault lies completely with the defendant and that the victim was not somehow a culpable contributory cause. Thus, we do not believe our holding lightens the prosecution's burden of proof under the statute.

We further do not find that our interpretation so exceeds a reasonable and foreseeable understanding of criminal liability under the statute that its application violates defendant's right to due process. (See *Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697] [state court's interpretation of statute so at odds with statutory language that it was not foreseeable and could not, as a matter of due process, be applied retroactive-ly].) As observed above, it is unreasonable, if not absurd, to read the statute and then conclude that it must not proscribe negligent care of a mischievous animal if the animal kills a person incapable of reasonably prudent conduct. Such a view assumes the Legislature intended to withhold protection from those who most need it. On the contrary, the statute puts a reasonable person on notice of criminal consequences if he or she fails to act with reasonable care in keeping a mischievous animal. In our view, defendant could (and

should) have reasonably foreseen that the statute would apply if his negligence allowed Willy to kill a person incapable of acting with reasonable care such as a two-year-old toddler.

Turning to the facts of this case, we note that minors under the age of five are, as a matter of law, deemed incapable of negligent acts, i.e., failing to exercise reasonable care under the circumstances. (*Christian* v. *Goodwin* (1961) 188 Cal.App.2d 650, 652-654 [10 Cal.Rptr. 507] and cases collected there.) "The proposition that 'An infant may be so very young that no negligence may legally be imputed to him' [citation], is predicated on the principle that a child of very early years is 'incapable of realizing that his heedless conduct might foreseeably lead to injury to another which is the essential capacity of mind to create liability for negligence.' [Citation.]" (*Ibid.*)

Given the legal incapacity of minors under the age of five to act with reasonable care, the sole factual issue in this case concerning the victim was his age: was he under the age of five and, therefore, excused due to incapacity from taking reasonable precautions against the attack that killed him.

The trial court here did not explicitly instruct the jury, "*If* you find that the victim was a minor under the age of five, then you need not find that he or she has 'taken all the precautions which the circumstances permitted, or which a reasonable person would ordinarily take in the same situation[.]' " (§ 399.) However, it did instruct the jury that the prosecution had to prove that the victim took reasonable precautions and that a minor under the age of five need not do so. Moreover, there could be no factual dispute concerning the victim's age. The record establishes that he was less than three years old.

Under the circumstances, therefore, we conclude that the trial court's instructions were essentially proper and correct, and any error in failing to explicitly require a finding concerning the victim's age was harmless beyond a reasonable doubt. (See *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]; *Chapman* v. *California* [1967] 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Dyer* (1988) 45 Cal.3d 26 [246 Cal.Rptr. 209, 753 P.2d 1]; *People* v. *Landry* (1989) 212 Cal.App.3d 1428 [261 Cal.Rptr. 254].)

### B.   *The Definition of "Mischievous"*

Defendant contends the trial court erred in instructing the jury that "mischievous," as used in section 399, means something "productive of

harm or injury" or something "capable of causing or tending to cause annoyance, trouble, or minor injury or damage to others." (See Webster's New Internat. Dict. 3d ed. (1981) p. 1442.)[7] He argues that this definition would include an animal its owner has no reason to think might injure someone but is "mischievous" because its barking annoys others. He claims the court's definition effectively relieved the prosecution of having to prove that Willy was mischievous. We find the court's definition to be incorrect.

In seeking to protect people from fatal attacks by "mischievous" animals, section 399 implies that a "mischievous" animal is one that may be dangerous to others if allowed to run free or kept in a negligent manner. Knowledge of an animal's "mischievous propensities" therefore puts an owner on notice of such danger or risk of harm, and his or her liability under the statute arises from the failure to act reasonably with knowledge of this risk. Consequently, we hold that "mischievous propensities" as used in the statute means those propensities that may naturally pose a risk of harm or injury to others.

This is the interpretation the court in *People* v. *Sandgren, supra,* 98 N.E.2d 460, gave a substantially similar statute. There, in discussing the meaning of the term "mischievous propensity," the court opined that a mischievous propensity was one from which injury is the natural result. (*Id.* at p. 465.)

In light of our interpretation of "mischievous propensity," we agree with defendant that the definition of "mischievous" used below was overbroad. It included propensities that may merely be bothersome or annoying but are not inherently or naturally dangerous to others. However, the court's erroneous definition was not prejudicial error so fundamental to the fairness of defendant's trial as to require reversal per se. (See *Rose* v. *Clark, supra,* 478 U.S. 570, 579 [92 L.Ed.2d 460, 471].)

Willy was not a regular house pet. Rather, the jury found that defendant trained Willy and kept him as a fighting dog and that it was reasonably foreseeable that he might kill the victim. There also was evidence of Willy's fighting ability and defendant's warnings to others that Willy was dangerous to humans. On the other hand, there was no evidence or argument that Willy possessed propensities that were annoying and/or bothersome but not potentially harmful or dangerous.

---

[7]We acknowledge that in our previous opinion denying defendant's petition for a writ of prohibition, we concluded the evidence was sufficient to try defendant under section 399. In so doing, we used the definition later adopted by the trial court. (See *Berry* v. *Superior Court* ■ (Cal.App.).)

Under the circumstances, we find no reasonable possibility that the jury could have relied or did rely on the erroneous part of the definition of "mischievous" and found defendant guilty based on a "mischievous propensity" that would not naturally result in injury. Indeed, as defendant himself concedes, "The fact of the dog's mischievousness was irrefutably established by the fact that the dog killed the child!"

Consequently, the definitional flaw was harmless under any standard of review. (*Chapman* v. *California, supra*, 386 U.S. 18; *People* v. *Dyer, supra*, 45 Cal.3d 26; *People* v. *Landry, supra*, 212 Cal.App.3d 1428.)

*C.   Failure to Give Unanimity, Proximate Cause, and Duty Instructions\**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

*III.   Existence of a Duty of Care to the Victim*

Defendant asserts that the scope of any duty he owed the victim is defined by Civil Code section 3342, a dog-bite statute. He argues that under this section he owes no duty toward trespassers such as the victim.[8] He explains that the statute reflects a legislative determination "that a dog owner owes no legal duty of care to protect trespassing children from injury by his confined dog" because "the legal responsibility for the care and supervision of children should fall where it most naturally belongs: on the parents." Thus, since he had no duty toward the victim, he claims that as a matter of law he could not have been negligent. We are unpersuaded.

Civil Code section 3342 creates a remedy. It allows one to recover damages caused by a dog bite without having to show fault, i.e., under strict liability. However, it applies only in specified circumstances, one of which is that the victim be lawfully on the premises when bitten. The statute does not purport to abrogate any common law remedies that might also be available to a dog-bite victim but merely withholds the benefits of strict liability from those guilty of trespassing.

Indeed, in 1988, the Legislature amended this statute so as to immunize government agencies that use dogs for military or police work. In so doing, it stated, "It is the intent of the Legislature in enacting this act to provide only a limited immunity from the strict liability imposed by Section 3342 of

---

\*See footnote, *ante*, page 778.

[8]Civil Code section 3342 provides, in relevant part, "(a) The owner of any dog is liable for the damages suffered by any person who is bitten by the dog while in a public place or lawfully in a private place, including the property of the owner of the dog, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness."

the Civil Code. *Any other cause of action predicated on common law theories of negligence, intentional tort, and other theories is unaffected by this act."* (See Stats. 1988, ch. 298, § 2, italics added.)

Given the absence of persuasive evidence, we decline to hold that this section was intended to be the *sole* remedy for one bitten by a dog on its owner's property. (See generally, 58 Cal.Jur.3d, Statutes, §§ 4, 5, pp. 296-303; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1219, 1220, pp. 654-655.)

Defendant's view that this section represents the exclusive remedy for dog bites would mean that a landowner must protect reasonably foreseeable trespassing children against all unreasonably dangerous conditions on his or her land *except* dangerous dogs. This view is absurd, for it suggests that in enacting the statute, the Legislature intended to eliminate the protection against dangerous dogs that previously existed under the common law.

Finally, we observe that although the criminal statutes applicable here rely on principles of negligence, nothing in this civil statute suggests that it creates a defense in a criminal action based on the victim's status as a trespasser. Defendant provides no persuasive authority that it does.

*Bauman* v. *Beaujean* (1966) 244 Cal.App.2d 384 [53 Cal.Rptr. 55] is inapposite, and defendant's reliance on it is misplaced. That case involved a civil action for damages resulting from a dog bite predicated *solely* on liability under the statute. As such, the failure to prove that the victim was lawfully on the defendant's property when bitten precluded recovery under the statute.

### IV.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is affirmed.

Premo, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied January 10, 1992, and appellant's petition for review by the Supreme Court was denied March 12, 1992. Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.

*See footnote, *ante*, page 778.