Filed 5/13/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO GONZALES FLORES,<br><br>      Defendant  and Defendant . | A135252<br><br>(Sonoma County<br>Super. Ct. No. SCR611939) |

In this case, we are called upon to determine whether substantial evidence supports the conviction of defendant Armando Gonzales Flores regarding the attack of an elderly man by a pit bull owned by defendant.  California does not criminalize mere ownership of a pit bull or any similar animal.  However, if a person knows his or her animal is mischievous and fails to exercise ordinary care, and as a result a human being suffers serious bodily injury or death, that person may be prosecuted pursuant to Penal Code[1] section 399.  On appeal, defendant maintains he used ordinary care and that the victim's injuries were not sufficiently severe so as to constitute serious bodily injury.  We affirm.

## I. EVIDENCE AT TRIAL

### A.      *Prosecution's Case*

#### 1.      *The Charged Incident*

On December 12, 2011, nearly 90-year-old William Siemsen, was living at 2827 Marlow Road in Santa Rosa.  Having just finished lunch, he was sitting in a chair in the front yard of his house when a dog came from the house next store, got hold of his 9-

---

[1]      Unless otherwise specified, all further statutory references are to the Penal Code.

1

year-old black Labrador, Luna, shook her and dropped her. The dog then bit Siemsen on his left leg, below the knee.

Santa Rosa Police Officer Stephen Bussell was driving home in his personal vehicle when he saw defendant's pit bull, Blue, chasing Luna in front of Siemsen's residence. Officer Bussell saw the dogs fight, he saw Luna break free of Blue, and then he saw Blue attack Luna again as Luna got near Siemsen, who was sitting in a chair near his garage. Siemsen yelled at the dogs as they fought. The dogs were up against Siemsen and it "almost looked like he was getting pushed over in his chair." He hit both dogs with his cane before Luna broke free of Blue. Officer Bussell then saw Blue bite Siemsen once, possibly twice. Officer Bussell described Siemsen's wound as "maybe half an inch wide by two to three inches in length . . . it was severely deep." Officer Bussell instructed defendant to secure Blue in a vehicle parked at defendant's neighboring residence. Defendant grabbed Blue by the collar and put him in the nearby car. According to Officer Bussell, defendant appeared to be under the influence of alcohol.

Sonoma County Deputy Sheriff Adrian Mancilla responded to the incident and was directed to assist Siemsen in getting to the hospital. Deputy Mancilla took photos of Siemsen's injury before and after medical treatment and prepared a report. He observed one small puncture wound and one large puncture wound to Siemsen's left leg. There appeared to be more, however. According to Mancilla, there was so much blood on Siemsen's left lower leg that it was hard to see the puncture wounds.

Siemsen was taken to the emergency room and treated by Mark LaGrave, M.D. Dr. LaGrave described the dog bite as "a dramatic injury," a deep laceration that "wasn't something that superficial." Dr. LaGrave explained that he chose to loosely close the wound with four sutures due to drainage concerns and the potential for infection. In assessing the severity of the wound, Dr. LaGrave expressed concerns regarding Siemsen's advanced age and diabetic status. As such, he believed the injury required "close follow-up and excellent wound care." Dr. LaGrave opined that it would take months before Siemsen would have full use of his leg again.

2

After the bite, Siemsen's leg hurt for hours. His leg was bandaged for a week, and he had a neighbor take him back to the hospital every three days to get the bandages changed. Ultimately, the wound healed and left no scar. Siemsen explained that he was "half crippled" before the attack and that the injury "[j]ust slowed everything down." Following the injury, someone brought Siemsen his dinner in the evenings.

Sonoma County Deputy Sheriff Michelle Buchignani was dispatched to 2827 Marlow Road. At the scene, defendant seemed "very, very nervous." After being advised of his *Miranda* rights, defendant told Officer Buchignani that Siemsen would not have been bitten if he had not tried to hit Blue. According to Deputy Buchignani, at the scene, defendant "was minimizing the victim's injuries." Deputy Buchignani testified that defendant had the slight odor of alcohol about him, but was not acting intoxicated.

Defendant told Deputy Buchignani that the county was aware of Blue's history and as a result Blue had been microchipped and neutered. According to Deputy Buchignani, defendant "blam[ed]" the county for Blue's violence. Defendant told her that "the dog had [] been aggressive with other dogs in the past, had attacked other dogs in the past." Deputy Buchignani described Blue as a "[r]eal powerful" animal, with a big head and large, muscular chest. As Blue was being removed from the vehicle by animal control staff, he "resisted quite a bit," biting at the staff and pulling back from them. In contrast, Deputy Buchignani described Siemsen's dog, Luna, as an older dog, approximately 10 years old with a graying muzzle, that appeared "very submissive" and exhibiting no aggressive behavior.

Sonoma County Animal Control Officer Jeff Clemens responded to the scene. Officer Clemens described Blue's behavior as "[v]ery concerning," as "[t]he animal was an extremely large animal. It displayed certain body language that was very, very obvious that it was a dangerous, dangerous animal." As he approached the vehicle where Blue had been contained, he heard a "very deep, low . . . growl." Officer Clemens observed that Blue had a "very direct, challenging eye stare." Officer Clemens, with the assistance of two deputies, was ultimately able to remove Blue from the vehicle using a

3

"rigid leash or catch pole." Once impounded at Animal Control, Officer Clemens remembered seeing Blue in a kennel, showing various "signs of aggression," including a "dominant stare," standing in a "very strong, postured position," as well as "growling [and] barring its teeth."[2]

### 2. Prior Incidents

Defendant and Blue had three prior incidents with the public. On June 29, 2011, James Bertolini was walking his 25-pound Terrier-Beagle on a leash when Blue charged toward him and his dog. When Blue got close, Blue started biting Bertolini's dog. Bertolini picked up his own dog and tried kicking Blue to get him to stop. After catching Blue under the chin, Blue backed off. Defendant came around the corner with a leash in his hand and tried to get Blue under control. According to Bertolini, it took defendant a couple of minutes to get the dog under control. Bertolini described Blue as being "really aggressive." Bertolini's dog suffered a slight puncture wound. Fearing he might run into the dog again, Bertolini's wife contacted Animal Control and made a report.

A little over a month later, another incident with Blue was reported. On August, 8, 2011, Kathleen Tryer had her dog on a leash and while walking, encountered defendant and Blue on a pathway. Tryer offered to take her dog back the other way, but defendant told her that he would hold his dog so she could pass. While she was trying to pass by, defendant's dog started pulling on the leash and "literally dragged" defendant toward Tryer and her dog. Even on the leash, defendant could not stop his dog from going after Tryer's dog and putting its mouth on Tryer's dog. Everyone started yelling at defendant's dog. A friend picked up Tryer's dog and defendant managed to pull his dog back. Thereafter, Tryer called Animal Control to report the incident.

Less than three months later, on October 28, 2011, another incident occurred. Ruth Richardson was standing outside her home with two adults and two kids, when defendant opened his door to get the mail and Blue ran out the door. With Blue running towards

---

[2]     Subsequently, defendant authorized Blue's euthanization.

her, she took cover in her home and grabbed her taser. Once inside her home, Blue "viciously" attacked her metal security screen door, which he bent while trying to get at her. Richardson described Blue as being "very, very aggressive" and "very strong." Richardson testified that if she had had a regular screen door rather than the metal security screen door, there was "no doubt" in her mind that the dog would have killed her and her child or her friend who had run into the garage.

Richardson testified that she was "terrified of this dog." Defendant and Blue had lived across the street from her for about a year. Several times Blue had gotten off leash and "came aggressively" towards Richardson and her child. And, three months before the October incident, Blue attacked Richardson's cat and "put a gash in his eye." Richardson described Blue as being "very, very aggressive" and "very strong." According to Richardson, defendant could not control Blue. She described an incident where defendant apparently had tried to take Blue out while riding his bicycle and Blue had pulled him off his bicycle.

Michelle Drocco was at Richardson's house on October 28, 2011, and she remembered a pit bull running across the street from a neighbor's house. As the pit bull charged toward the group in front of Richardson's house, everyone ran; Drocco took cover in Richardson's garage. Drocco described the dog as "[v]ery angry, agitated, [and] scary." According to Drocco, the owner could not control the dog. As the owner tried pulling the dog back, the dog "kept going forward" and was "overpowering" the owner.

### 3. *Potentially Dangerous Animal Designation*

On June 30, 2011, Sonoma County Animal Control Officer Justin Foster issued a potentially dangerous animal warning to defendant (June warning). The June warning notice, which was admitted into evidence, advised defendant that pursuant to the Santa

Rosa City Code "[a] potentially dangerous animal, *while on the owner's premises, shall, at all times, be kept indoors, or in a secure enclosure.*" (Italics added.) [3]

On November 3, 2011, defendant voluntarily agreed to designate Blue as a potentially dangerous animal (November agreement). The designation was based on two occurrences of "defensive action"—on June 29, 2011, and October 28, 2011—within a three-year period and gave rise to the requirement that Blue be neutered. The November agreement listed various Santa Rosa City Code sections but did not further describe such sections. Officer Foster testified that although he went over the consequences of owning a potentially dangerous animal, he was unsure whether he advised defendant about the specific requirements that the dog be muzzled whenever off the owner's property (Santa Rosa City Code, Tit. 7, art. I, § 7-30.050(A)(2)(b), or that the dog must wear a special collar indicating that it is a potentially dangerous animal (*id.* at (A)(2)(c)). Officer Foster also could not remember whether he told defendant that he was required to post a sign at

---

[3]     We take judicial notice on our own motion of the Santa Rosa City Code Chapter 7-04.0210(O)(3) (Evid. Code, § 452), which states that a "[p]otentially dangerous animal" includes: "Any animal which, when unprovoked, on two separate occasions within the prior 36-month period, engages in any behavior that requires a defensive action by any person to prevent bodily injury when the person and the animal are off the property of the owner or keeper of the animal." (Santa Rosa City Code, Tit. 7 Animals, Ch. 7-04 General Provisions, § 7-04-010, Definitions.) The Santa Rosa City Code further requires that "[a] potentially dangerous animal, *while on the owner's premises, shall, at all times, be kept indoors, or in a secure enclosure.*" (*Id.* at Chapter 7-30 Potentially Dangerous and Vicious Animals, Art. I, § 7-30.050, Disposition of potentially dangerous animals, subd. (A)(2); italics added.) Owners of potentially dangerous animals are also required to muzzle their animal when off the owner's premises, as well as outfit the animal with a collar or other device clearly visible at all times that designates the animal as a potentially dangerous animal. (*Id.* at subds. (b)-(c).) Additionally, the owner must post a large sign in a conspicuous place on the property advising that a potentially dangerous animal is kept at this place. (*Id.* at (A)(3).) At trial, defendant attempted to challenge the propriety of the designation of Blue as a potentially dangerous animal and further attempted to disclaim any knowledge of the requirements in keeping such an animal. However, the propriety of that ruling, with its attendant requirements, was not before the trial court and is not an issue on appeal. (See *id.* at § 7-30.020.)

his residence indicating that a potentially dangerous animal was at the premises.~(RT 9 719-720)~ (Santa Rosa City Code, § 7-30.050(A)(3).)

**B.      Defense Case**

Armondo Gomez testified that on December 12, 2011, he was living at 2821 Marlow Road, next door to Siemsen. Defendant and his son were staying with him. On that date Blue was tethered to a "big chain," four feet long and anchored in the ground in the front yard. According to Gomez, Siemsen's Labrador Luna came on to his property and barked at Blue. It was in response to the barking that Blue got loose from his collar and chased Luna back on to Siemsen's property. Gomez did not see Blue get loose and did not know how Blue was able to get loose. Gomez also did not see Blue chase Luna. The next thing he saw was the two dogs on Siemsen's property. Gomez then saw defendant trying to get Blue off of Luna, and heard Siemsen yelling for Blue to get off of Luna, and saw Siemsen hitting Blue with a cane. Gomez testified that both dogs were biting each other and that he "guessed" Siemsen got bit by Blue, but stated that he did not see it happen.

Gomez denied that either he or defendant were drinking alcohol that day. Defendant and Gomez put Blue in a truck. Gomez testified that he had never seen Luna on a leash and that this was not the first time Luna had been on his property. Gomez had never seen Blue break free from where he had been tethered outside his house. He had also never seen Blue act aggressively toward anyone or any dog.

Margaret Hernandez testified that on December 12, 2011, she was living at 2821 Marlow Road. Prior to that date, she had never seen Blue untethered while outside. In contrast, she had never seen Luna on a leash.

Defendant's girlfriend, Tiffany Olibas, testified that whenever defendant and his son were staying on Marlow Road, she only observed Blue to be kept either in a doghouse in the garage or "tied up out front on the ball and chain." She never saw Blue unrestrained on Marlow Road. Olibas also never saw defendant drink alcohol or smelled it on him.

7

Defendant was convicted by a jury of violating subdivision (b) of section 399. Imposition of sentence was suspended and defendant was placed on probation for a period of three years with various terms and conditions.

## I. DISCUSSION

Defendant contends his conviction must be reversed because there is insufficient evidence that he acted without ordinary care and that Siemsen suffered serious bodily injury within the meaning of section 399. As we shall explain, neither contention has any merit.

### A. *Failure to Exercise Ordinary Care*

Subdivision (b) of section 399 provides as follows: "If any person owning or having custody or control of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and the animal, while so at large, or while not kept with ordinary care, causes serious bodily injury to any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a misdemeanor or a felony."

"The basic purpose of section 399 is to protect people against fatal attacks by 'mischievous animals,' where the victim is in no way at fault for the attack. (Cf. *People v. Sandgren* (1951) 302 N.Y. 331 [98 N.E.2d 460, 465] [explaining similar statute].) It does so by punishing those who know their animals are 'mischievous' but allow them to run free or keep them in a negligent manner." (*People v. Berry* (1991) 1 Cal.App.4th 778, 783.) Section 399, "[i]n seeking to protect people from fatal attacks by 'mischievous' animals, . . . implies that a 'mischievous' animal is one that may be dangerous to others if allowed to run free or kept in a negligent manner. Knowledge of an animal's 'mischievous propensities' therefore puts an owner on notice of such danger or risk of harm, and his or her liability under the statute arises from the failure to act reasonably with knowledge of this risk. Consequently, . . . 'mischievous propensities' as

8

used in the statute means those propensities that may naturally pose a risk of harm or injury to others." (*People v. Berry, supra,* 1 Cal.App.4th at p. 786.)

Although there are no reported decisions discussing "ordinary care" as used in section 399, CALCRIM No. 2950, which was given to the jury in the instant case, defines it as "using reasonable care to prevent reasonably foreseeable harm to someone else. A person fails to use ordinary care if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." In other words, section 399 requires criminal negligence.

"Criminal negligence requires a gross violation of an existing duty of care. [Citations.] There must be proof of 'aggravated, culpable, gross, or reckless conduct, which is such a departure from the conduct of an ordinarily prudent person under the same circumstances as to demonstrate an indifference to consequences or a disregard of human life.' [Citation.] The question is 'whether a reasonable person in the defendant's position would have appreciated the risk his or her conduct posed to human life.' [Citation.] The defendant's subjective awareness is irrelevant. [Citation.]" (*People v. Medlin* (2009) 178 Cal.App.4th 1092, 1103; see also § 7, subd. (2).)

Here, defendant maintains that he acted as any ordinarily prudent person would have when he tethered and chained Blue outside on December 12, 2011. Defendant concedes that he had knowledge of Blue's history of acting aggressively toward other dogs and people. However, he insists that he exercised ordinary care on the date in question because Blue "had not broken free of his tethering before and he had not bitten anyone before." We disagree. Although the record does not contain any evidence that prior to the challenged incident Blue had either broken free of his tethering or had bitten a person, that is not the relevant question. Rather, the issue is whether it was reasonable for defendant, knowing Blue's propensities, to have kept Blue in the manner that he did. There was overwhelming evidence that Blue's aggressiveness, combined with his massive strength and power, made him uncontrollable and a danger to the public. Indeed, the county designated Blue as a "potentially dangerous" animal. In the June warning

9

notifying defendant about Blue's impending status, a potentially dangerous animal, the county expressly advised defendant that "[a] potentially dangerous animal, *while on the owner's premises, shall, at all times, be kept indoors, or in a secure enclosure.*" (Italics added.) Although the November agreement wherein defendant voluntarily agreed to Blue's designation as potentially dangerous animal did not explicitly state that Blue was either to be kept indoors or in a secure enclosure while at defendant's residence, the agreement nevertheless references the applicable Santa Rosa City Code section reflecting this requirement. (See Santa Rosa City Code, § 7-30-050.)

Moreover, it is undisputed Blue had an extensive history of unprovoked aggressive attacks. Prior to the instant incident, there had been at least three other occasions in the preceding months where Blue had exhibited dangerous propensities in public whether or not he was restrained. In one attack, Blue, while not on a leash, charged toward a man and his dog. When defendant appeared with a leash, it took him several minutes to get Blue under control. Another attack occurred despite Blue being on a leash. There, Blue lunged at a woman and her dog, as he "literally dragged" defendant on a pathway. Even while restrained, defendant could not stop Blue from attacking the other dog. In yet another incident, Blue bolted through an open door in defendant's residence and caused a group of people across the street to run in fear and seek cover. In the course of this attack, Blue managed to dent a metal security screen door. The victim in that attack testified that she was "terrified" of Blue and that there was no doubt in her mind that the dog would have killed her and her child, or her friend who had hidden in the garage, if she did not have the metal door in place.

Despite the positive steps that defendant took to secure Blue, on this record, the jury could reasonably infer that defendant's efforts were wholly inadequate. By all accounts, Blue was a very powerful and aggressive dog that had the ability to overpower defendant and to injure anyone or anything in his path. Although Blue had been restrained by a "big chain," there was unimpeded, unsupervised access to Blue. Accordingly, we conclude substantial evidence supports the jury's finding that defendant failed to act as a reasonably careful person would in the same situation.

To the extent defendant suggests that Siemsen was partially at fault for allowing his dog Luna to "torment" Blue and for hitting Blue with his cane, these claims similarly are without merit. There was conflicting evidence regarding where the attack began. According to Siemsen, Blue came onto his property and attacked him and his dog. Although defendant's friend, Gomez, testified that Luna came onto his property and barked at Blue, Gomez neither saw how the fight started nor how Blue became untethered. Gomez also did not see Blue bite Siemsen. The only other witness to the attack was Officer Bussell, who testified that he only saw the two dogs on Siemsen's property. With respect to Siemsen's use of his cane, Officer Bussell testified that it was only *after* Blue starting attacking Luna, that he saw Siemsen hit both dogs in order to stop the attack. This evidence demonstrates that Siemsen used his cane defensively. (See, e.g., *People v. Lee* (2005) 131 Cal.App.4th 1413, 1429 [person has right to reasonable self-defense when confronted by an aggressive dog]; *People v. Wicker* (1974) 78 Misc. 2d 811, 814 [357 NYS.2d 597] [defendant entitled to self-defense when he shot and killed a vicious dog that ran onto his property and attacked his dog].) We conclude that substantial evidence supports the conclusion that Siemsen was not at fault for the attack or his injuries.

In sum, given Blue's prior history—his demonstrated viciousness in attacking other dogs, unprovoked; his attempted unprovoked attack of Richardson and her family and friends, together with defendant's inability to overcome his dog's strength, even on a leash—leaving Blue chained up, close to a public sidewalk in a residential neighborhood, unattended in an unenclosed area, constitutes substantial evidence to support the jury's finding that appellant failed to act as a reasonably careful person would in the same situation.

## B. Serious Bodily Injury

Defendant next contends there was insufficient evidence that Siemsen suffered serious bodily injury.

It is well settled that the determination of the extent of such an injury is essentially a question of fact for the trier of fact, not a question of law. " ' "Whether the harm

11

resulting to the victim . . . constitutes great bodily injury is a question of fact . . . . [Citation.]  If there is sufficient evidence to sustain the . . . finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' [Citations.]" (*People v. Escobar* (1992) 3 Cal.4th 740, 750; see also *People v. Kent* (1979) 96 Cal.App.3d 130, 136-137 [observing that concepts of "serious" and "great" bodily injury are substantially similar].)

Section 399 does not further define "serious bodily injury."[4]  However, CALCRIM No. 2950, which as noted previously was given to the jury, defines it as "a serious impairment of physical condition.  Such an injury may include, but is not limited to:  loss of consciousness, concussion, bone fracture, protracted loss or impairment of . . . any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement."

Here, there was evidence that Siemsen was badly bitten by defendant's dog. Photographs documenting his injuries were submitted to the jury.  Siemsen suffered extensive bleeding and was taken to the emergency room by ambulance.  He suffered two puncture wounds, one of which required four sutures.  Defendant suggests that victim's injuries did not constitute a "serious impairment of physical condition" within the purview of section 399, because the injury healed and left no scar.  Defendant adds that "four sutures" does not constitute "extensive suturing."

We do not find critical to our determination the fact that the wound ultimately healed leaving no scar.  Nor do we agree that the wound was not serious because it only required four sutures.  Although this may well not constitute "extensive suturing," the treating emergency room doctor testified that the number of sutures used was discretionary and that he elected to use fewer sutures and not close the wound tightly, in

---

[4]  As the court in *People v. La Fargue* (1983) 147 Cal.App.3d 878, 886-887, aptly noted: "The term 'great bodily injury' has been used in the law of California for over a century without further definition and the courts have consistently held that it is not a technical term that requires further elaboration.  [Citations.]"

12

what he termed "loose approximation," because he was concerned, given the wound's depth and source, about the potential for infection.

We must view the evidence as a whole, under a deferential standard of review, to ascertain whether there is substantial evidence upholding the jury's conclusion that Siemsen's injuries constituted serious bodily injury. In the present case, there exists substantial evidence from which the jury could conclude that the puncture wounds—even though they left no scars and caused no permanent disability, when combined with the victim's age, status as a diabetic, his extensive follow-up wound care, and lengthy recovery period—were injuries that were more than merely transitory, or lacking in seriousness. (See *People v. Johnson* (1980) 104 Cal.App.3d 598, 609.) The treating emergency room doctor characterized the wound as "dramatic," which "wasn't something that superficial." Although Dr. LaGrave did not believe the wound would permanently disable Siemsen, he did opine that it would take a long time to heal, and would require close follow-up and excellent wound care. Further, Dr. LaGrave opined that Siemsen's use of his leg would be compromised for months. Moreover, Siemsen testified that upon discharge he had to have someone come to his house to assist him in the days that followed.

Accordingly, we conclude that substantial evidence supports the jury's conclusion that Siemsen's injuries constituted serious bodily injury.

### III. DISPOSITION

The judgment is affirmed.


REARDON, P. J.


We concur:

RIVERA, J.

HUMES, J.

13

Trial Court:                   Sonoma County Superior Court

Trial Judge:                Hon. Kenneth J. Gnoss

Counsel for Appellant:      Brian Hong

Counsel for Respondents:    Kamala D. Harris
Attorney General of California
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Senior Assistant Attorney General
Rene A. Chacon
Supervising Deputy Attorney General
Juliet B. Haley
Deputy Attorney General