Filed 8/6/13  P. v. Gonzalez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

JOSE A. LOPEZ GONZALEZ et al.,

     Defendants and Appellants.

E053751

(Super.Ct.No. FVA1000466)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Arthur Harrison, Judge.  Affirmed.

Correen Ferrentino, under appointment by the Court of Appeal, for Defendant and Appellant Jose A. Lopez Gonzalez.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Judith Mendez Lopez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

1

This case involves defendants and appellants, Jose A. Lopez Gonzalez (Gonzalez) and his wife, Judith Mendez Lopez (Lopez). A jury found Gonzalez and Lopez (collectively "defendants") guilty of seven counts each of knowingly owning a mischievous animal that caused serious bodily injury to a human being. (Pen. Code, § 399, subd. (b).)[1] The trial court sentenced defendants to prison for terms of four years, four months.

Lopez raises six issues on appeal. First, Lopez contends there is not substantial evidence she knew her dogs were vicious. Second, Lopez asserts substantial evidence does not support two of the four convictions related to the victim Destiny, because the evidence reflects Destiny was bitten by only two dogs. Third, Lopez contends her sentences for all but one of her convictions should have been stayed pursuant to section 654. Fourth, Lopez contends the multiple convictions violate the law against double jeopardy because she committed only one negligent act. Fifth, Lopez asserts the trial court erred in instructing the jury on the knowledge element of the offense. (CALCRIM No. 2950.) Sixth, Lopez contends the trial court erred by not instructing the jury on the law of unanimity. We affirm the judgment.

Gonzalez raises three issues on appeal. First, Gonzalez asserts substantial evidence does not support the finding he knew his dogs were vicious prior to the attack. Second, Gonzalez contends the evidence does not support a finding Destiny was bitten by four dogs. Third, Gonzalez contends the trial court erred in instructing the jury on

---

[1] All further statutory references are to the Penal Code unless indicated.

the knowledge element of the offense.  (CALCRIM No. 2950.)  We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

In 2010, Josephine[2] and her six children were residing in Fontana.  Josephine's children are:  (1) Andrew, who was 12 years old at the time of trial in 2011; (2) Star, who was 10 years old in 2011; (3) Princess, who was eight years old in 2011; (4) Hector, who was seven years old in 2011; (5) Destiny, who was six years old in 2011; and (6) Precious, who was four years old in 2011.

On February 1, 2010, Josephine took her six children for a walk.  The family walked on a trail along a canal.  Five to 10 minutes into the walk, Josephine observed four dogs barking and running loose.  Josephine was not concerned about the dogs because they were far away from the family and eventually the dogs returned to a residence.  However, approximately five minutes later the dogs returned.  The dogs were at the family's location "[b]efore [the family even] realized that [the dogs] were there."

The children became scared.  The family ran and threw rocks at the four dogs. The dogs chased the family and knocked some of the family members, including Josephine, to the ground.  Josephine was attacked by a black pit bull type of dog.  When Josephine was knocked down, she was holding Precious, and Hector was grabbing onto her, so all three were knocked over.  Josephine was not bitten during the attack.  When

_____

[2] The victims' first names were used in the trial court.  For the sake of clarity, we also use the victims' first names.  No disrespect is intended.

3

Josephine managed to rise from being knocked down, she saw dogs "had Destiny already." Josephine began throwing rocks at the dogs.

Destiny yelled and screamed while on the ground. The dogs were biting Destiny and "wouldn't let her go." Destiny was bitten by two black dogs. The third and fourth dogs were "brown and white, black spotted dogs." It appeared to Josephine that the dogs were eating Destiny. Approximately four minutes into the attack, Josephine used her cellular telephone to call 911.

Antonio Galvan was in the backyard of his residence when he saw the dogs attacking the family. Galvan saw four dogs attacking Destiny. Galvan believed one of the dogs was trying to kill the child, while a second dog was trying to "take the leg." Galvan jumped over his fence to help the family, but the dogs attempted to attack him, so he left to find more help.

Eventually, Galvan and three other men came to assist the family. The men used boards to hit the dogs multiple times. The dogs left the family and ran home. The attack lasted for five to 10 minutes. Galvan believed Destiny was dead as a result of the attack. Josephine did not see anyone standing near the residence where the dogs ran. The dogs bit three of the children: Destiny, Hector, and Princess. The children were taken to a hospital.

Hector suffered wounds on his legs and hips. Hector required approximately 200 staples to close his various wounds. Princess suffered one wound on her leg. Destiny was hospitalized for 12 days. Destiny fell into a coma and remained comatose for seven days. Destiny suffered wounds on her throat, her head, the right side of her chest, and

her upper thighs. Additionally, Destiny suffered broken ribs and a collapsed lung. All three children suffered permanent scars.

Fontana Police Officer Guerrero responded to Josephine's 911 call. When Guerrero arrived at the location of the attack, he saw dogs "walking, stopping, [and] barking" at people. Guerrero observed a group of men "trying to fend off the dogs" by throwing rocks at them. The dogs retreated and entered the yard of a residence, by going through a hole under the residence's chain-link fence. Guerrero saw three holes under the fence. The chain-link did not touch the ground, and there was "a gap where the dogs could easily just crawl under."

Guerrero approached the yard. He saw five dogs: one mastiff that was tied to a truck, and the four pit bulls he had seen go under the fence. As Guerrero neared the fence, the dogs began putting their heads under the fence, as though trying to exit the yard. Guerrero pepper sprayed the dogs multiple times and eventually ran out of spray. After the spray was gone, a black pit bull tried exiting the yard. Guerrero shot the dog. The dog died from the gunshot.

Jamie Simmons, an animal services officer for the Fontana Police Department, also responded to the 911 call. Simmons went to the location where the attack took place and then to the house where Guerrero had already shot one dog. Simmons saw the other dogs "fence fighting" with the police officers. The three pit bulls "appeared to be highly agitated." Simmons was surprised the dogs were agitated because it had taken her approximately 25 minutes to arrive at the house after receiving the dispatch.

Simmons pepper sprayed the dogs, but the dogs did not retreat, which is "very unusual" behavior. As Simmons tried to capture the black pit bull, using a five-foot pole with a loop on the end, the dog grabbed her sleeve and ripped it. If Simmons had not been wearing her jacket, the dog would have bitten her. Eventually, Simmons caught the black pit bull. At that point, a person inside the residence, Maria Mendez (Mendez), stepped outside the house. Mendez is Lopez's niece, and she lived at the house. Mendez appeared "surprised by all the noise and activity." The remaining two pit bulls came to Mendez after "a couple of commands." Simmons took the dogs from Mendez.

The fence around the yard, where the dogs had entered, was "flimsy." The fence was haphazardly constructed—it was not anchored in cement. The area of the fence where the dogs entered and exited appeared "bowed out," indicating the dogs had entered and exited "many times." There was a "tread path" or worn foot path on the ground leading to the one of the holes under the fence. Various items had been placed along the fence to block different holes, such as wood, cement blocks, and a ceramic kitchen sink.

Simmons transported the dogs to the City of San Bernardino Animal Shelter. The dogs remained unusually aggressive at the shelter. Simmons finds dogs tend to be less aggressive upon arriving at the shelter, because they are in a neutral location and no longer protecting their territory; however, these dogs remained aggressive. Simmons had to seek assistance from another officer to transfer the dogs from the truck to the kennels. None of the dogs had licenses, rabies vaccinations, or collars.

The next morning, Simmons returned to the shelter to evaluate the dogs. The smaller of the four dogs, a pit bull mix (approximately 57 pounds), was fearful and agitated. The dog would bite if cornered, and not retreat. In Simmons opinion, the dog was "led to have bad behavior since the beginning of his ownership . . . ."

A second pit bull, the one that ripped Simmons's sleeve, was agitated and aggressive. The dog weighed approximately 80 pounds. The dog's agitation did not diminish at the shelter, which was "very surprising behavior." Typically, aggressive dogs will eventually relax at the shelter, but this dog did not calm down. The dog was "very tense" and "more agitated by children walking by as opposed to adults."

The black pit bull that was shot weighed approximately 71 pounds. The fourth pit bull, which had brindle coloring, weighed approximately 68 pounds. The fourth pit bull was also aggressive, lunging at the kennel gate as people passed by.

Simmons concluded defendants were "grossly irresponsible" pet owners, taking into consideration defendants' fence, amount of dogs, and the dogs' breeds. Simmons said this attack was "the worst case [she had] ever responded to as far as animal bites to multiple victims."

Defendants and Mendez shared the responsibility of caring for the dogs; however, the dogs belonged to defendants. Mendez had previously discussed with Lopez the idea of "getting rid of the dogs." Mendez wanted to be rid of the dogs because "'she was afraid of the dogs.'" Defendants had the dogs to protect the various tools scattered throughout their yard.

7

In 2006, Gary Ili was a truck driver. On June 19, 2006, he was making a delivery in Fontana. Ili exited the cab of his truck and walked to the business where he was delivering sodas. As Ili walked, he passed by a residence and saw pit bulls behind a fence. As Ili approached the business's entrance, a brown pit bull began biting Ili's left ankle. The dog "locked on to [Ili's] ankle." Ili kicked the dog three times with steel toed boots, and the dog finally released Ili. The business owner called animal control. Ili suffered six puncture wounds on his right and left legs.

Ili filed a "full complaint" with animal control. Ili learned Lopez was the dog's owner. Approximately three weeks later, Ili returned to the location of his dog attack to make another delivery. While Ili was making the delivery, Lopez approached him and said, "'My dog wouldn't bite you.'" Ili responded, "'Your dog bit me.'" Lopez said, "'It wouldn't do that.'" Ili saw the pit bull at the residence, pointed to it, and said, "'That brown pit bull bit me.'" After that, Ili left. In 2006, Lopez received a citation for the dog biting Ili, and the dog was quarantined.

During closing argument, the prosecutor asserted: Count 1 consisted of the bite on Princess's leg; Counts 2 and 3 were comprised of two dogs biting Hector; Counts 4, 5, 6, and 7 consisted of each of the four dogs biting Destiny.

## DISCUSSION

### A.    KNOWLEDGE

Defendants contend there is not substantial evidence supporting the finding they knew the dogs had vicious propensities. We disagree.

8

When applying the substantial evidence standard, "we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019.)

The standard remains the same if the issue involves circumstantial evidence. "'"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]"' [Citation.]' [Citations.]" (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1020, italics omitted.)

Defendants' crimes require proof that they had knowledge of the dogs' propensities to injure people or create a risk of harm to people. (*People v. Berry* (1991) 1 Cal.App.4th 778, 786.)

Defendants cared for the dogs—providing them food and water. Thus, the record reflects defendants regularly saw the dogs. Next, the record reflects the dogs were unusually aggressive, in that (1) they did not retreat when pepper sprayed, (2) did not calm down upon arriving at the shelter, and (3) remained aggressive days after being at the shelter. From this evidence, it can reasonably be inferred that the dogs were prone

9

to aggressive behavior. The dogs did not have an isolated incident of aggression; rather, aggression was their natural and near constant disposition, because they were continually aggressive in situations where other dogs would have eventually relaxed.

The dogs displayed their aggressiveness by (1) biting people if given an opportunity; (2) jumping on the fence toward the officers; (3) charging at their kennel fences; and (4) lunging toward people. This evidence creates an inference that the dogs' aggressive tendencies were directed at humans, as opposed to small animals or one another. Further, Mendez told Lopez she wanted to get rid of the dogs. Mendez wanted to be rid of the dogs because she was afraid of them. From this evidence, a reasonable trier of fact could infer that the dogs acted aggressively when in the presence of their caretakers, i.e., defendants and Mendez. Thus, given the evidence that defendants regularly saw the dogs, the dogs were disposed to aggressive behaviors toward humans, and Mendez was afraid of the dogs, a reasonable person could conclude defendants knew of the dogs' vicious propensities toward people. Therefore, the "knowledge" element is supported by substantial evidence in regard to both defendants.

Moreover, as to Lopez, the record reflects she was notified that one of her pit bulls bit Ili in 2006. When Lopez did not believe her dog would have injured a person, Ili personally pointed out the dog to Lopez. From this evidence, a reasonable person could conclude Lopez was aware her dogs had problematic behaviors, because it is unlikely one dog would bite a person walking down the street, while all the other dogs were well-adjusted and trained. Thus, the evidence of Lopez's knowledge is even more substantial.

10

Lopez asserts the knowledge evidence does not meet the substantial evidence standard because the holes under the fence do not prove a propensity for vicious behavior. We agree the fence evidence is not related to the element of knowledge; however, there is other evidence reflecting defendants' knowledge of the dogs' propensities for viciousness, so we find this argument unpersuasive.

Second, Lopez argues there were no prior reports about these particular four dogs previously biting a person. We agree; however, as set forth *ante*, one can infer from the 2006 biting incident that Lopez had an awareness of her dogs having problematic behaviors that needed to be addressed. Accordingly, we find this argument to be unpersuasive.

Third, Lopez contends that Mendez's fear of the dogs has "nothing to do with [Lopez's] knowledge." Again, Mendez's statement is useful evidence because it reflects the dogs were likely displaying aggressive behavior prior to the attack. Mendez's statement allows for an inference to be made by the trier of fact. While it is not direct evidence of Lopez's knowledge, it adds to the circumstantial evidence. Thus, we find Lopez's argument to be unpersuasive.

Lopez and Gonzalez assert it is problematic to consider the dogs' aggressive behavior after the biting incident, because it does not show how the dogs behaved *prior* to attacking the victims. This argument is not persuasive because it fails to address the inference that can be drawn from the dogs' post-attack aggression when combined with the evidence of (1) Mendez's statement that she was afraid of the dogs prior to the attack, (2) the 2006 biting incident, and (3) the dogs' inability to reach a state of calm

11

days after attacking the victims. These three items of evidence lead to the reasonable inference that defendants' dogs were likely highly aggressive prior to the attack.

Gonzalez asserts the proof does not meet the substantial evidence standard because there was testimony from defendants' neighbor reflecting she regularly interacted with the dogs and they were not aggressive. Gonzalez's argument is not persuasive because we must look at the evidence in the light most favorable to the judgment. As set forth *ante*, there is substantial circumstantial evidence supporting the knowledge finding.

B.      FOUR COUNTS PERTAINING TO DESTINY

Defendants contend substantial evidence does not support two of the four counts pertaining to Destiny because the evidence reflects Destiny was bitten by only two dogs, not four. We disagree.

We again apply the substantial evidence standard set forth *ante*. "'Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 711.)

Galvan testified that he was in the backyard of his residence when he saw the dogs attacking the family. Galvan said, "And I saw four dogs shaking something." Galvan believed the four dogs were shaking a doll; however, Galvan later realized the "doll" was Destiny. During the direct examination of Galvan, the following exchange took place:

12

"[Prosecutor]: Now, were there four dogs on the little girl or one dog?

"[Galvan]: Four, but one dog is trying to kill her. The other dog only tried to take the leg. But one dog is taking right here (indicating).

"[Prosecutor]: But there's four dogs attacking the little girl?

"[Galvan]: Yes. Same time."

Galvan's testimony supports the conclusion that all four dogs attacked Destiny, because Galvan clarified that all four dogs were harming the girl. Accordingly, Galvan's testimony is substantial evidence supporting four different counts relating to Destiny—one count for each dog.

Lopez asserts the evidence only supports a finding that Destiny was attacked by two dogs because "multiple witnesses" said they saw only two dogs harming Destiny. As explained *ante*, "'[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness'" can satisfy the substantial evidence standard. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 711.) In this case, Galvan twice confirmed that he saw four dogs attacking Destiny. There is nothing impossible or inherently improbable about Galvan's testimony given that there were four dogs present during the attack. Accordingly, substantial evidence supports the four separate convictions related to Destiny.

Gonzalez asserts Galvan's testimony is not reliable because five other witnesses stated they only saw two dogs biting Destiny and Galvan admitted it was difficult to see the attack due the incident occurring at dusk. Gonzalez's argument is not persuasive because while Galvan's testimony may be questionable, it is not improbable or

13

impossible. The rule we must apply is as follows: The testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable. (*People v. Elliott* (2012) 53 Cal.4th 535, 586.) There were four dogs at the attack site when Destiny was attacked, so Galvan's testimony is not physically impossible in that it was possible for four dogs to attack Destiny. Galvan's testimony is not inherently improbable because he said he witnessed the attack, and while it was more difficult to see because the attack was occurring at dusk, he twice confirmed he saw four dogs attacking Destiny.

C.     SECTION 654

Lopez contends the trial court erred in sentencing her because all but one of her sentences should have been stayed pursuant to section 654. Alternatively, Lopez asserts one of the counts pertaining to Hector and three of the counts pertaining to Destiny should have been stayed pursuant to section 654. Lopez argues that her only criminal act was "not maintaining the fence," and therefore she could not be punished for seven different acts. We disagree.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Lopez's argument raises a legal issue involving statutory interpretation, so we apply the de novo standard of review. (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.) "We look first to the statutory language to determine the Legislature's intent; if the language is clear and unambiguous, there is no need for construction." (*Ibid.*)

Section 399, subdivision (b), provides: "If any person owning or having custody or control of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and the animal, while so at large, or while not kept with ordinary care, causes serious bodily injury to any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a misdemeanor or a felony."

The plain language of the statute reflects it is not simply punishing the failure to maintain a fence. The crime set forth in section 399, subdivision (b), is not focused on home maintenance. Rather, the plain language of the statute reflects a crime is committed when (1) a dog causes serious bodily injury to a person, (2) the victim did not instigate the attack, (3) the owner had knowledge of the dog's vicious propensities, and (4) the owner did not contain the dog. The failure to maintain the fence is one of the conditions or elements in the crime, but it is not the whole crime. The other acts involved in the crime are: (1) owning four dogs while knowing of their vicious propensities, and then (2) the dogs' acts of inflicting serious bodily harm. Thus, the crime does not simply involve the act of failing to maintain a fence. Thus, we conclude the trial court did not err by not staying all but one of Lopez's sentences because Lopez

15

committed more than one act under the statute by owning four dogs that attacked three different victims.

We now address Lopez's alternative argument that there should only be one sentence per victim: one sentence for Princess, one for Hector, and one for Destiny. Lopez argues this alternative in case this court concluded the failure to maintain the fence was one crime with multiple victims. (See *People v. Oates* (2004) 32 Cal.4th 1048, 1063 ["'[T]he limitations of section 654 do not apply to crimes of violence against multiple victims'"].)

As explained *ante*, section 654 does not apply in this case because Lopez's criminal act is not simply the failure to maintain a fence. The crime also involves harboring vicious animals with knowledge of their viciousness and then the animals' act of seriously injuring a person. Accordingly, we reject Lopez's alternative argument because the multiple victim exception is not being applied due to Lopez committing seven different crimes.

The seven different crimes consist of the following: Lopez harbored dogs knowing of their vicious propensities, her failure to maintain the fence permitted the dogs to run loose, while running loose one of the dogs Lopez harbored attacked Princess (one count), two of the dogs Lopez owned attacked Hector (two counts); and four of the dogs Lopez owned attacked Destiny (four counts).

D.     DOUBLE JEOPARDY

Lopez contends the multiple convictions violate the law against double jeopardy because she committed only one negligent act—failing to maintain the fence.  We disagree.

"""[T]he Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense.'  [Citation.]"  [Citation.]'"  (*People v. Izaguirre* (2007) 42 Cal.4th 126, 133.) Lopez's argument focuses on the multiple punishment protection of the Double Jeopardy Clause.

As explained *ante*, in our section 654 discussion, Lopez committed seven different crimes.  Lopez harbored four dogs that she knew to have propensities for vicious behavior.  Lopez did not properly contain the dogs, and the dogs were able to roam the neighborhood.  One of the dogs inflicted a serious injury on Princess, two of the dogs inflicted serious injuries on Hector, and four of the dogs inflicted serious injuries on Destiny.  By harboring four dogs with vicious propensities and not properly containing them so that they came into contact with three victims, Lopez is responsible for the individual dogs' attacks on the individual victims; thus, one conviction for Princess, two convictions for Hector, and four convictions for Destiny—seven separate crimes.

Lopez argues that the gravamen of section 399, subdivision (b) is permitting an animal to escape confinement and injure a person. Therefore, Lopez reasons, "[I]f one dog escapes and bites five people, there still is only one negligent act, so there is only one offense." Lopez asserts the one offense is failure to maintain a fence. Lopez appears focused on the "escape confinement" portion of her point, as opposed to the "injure a person" portion of the assertion.

Lopez has provided this court with the legislative history for section 399.[3] (Assem. Bill No. 1709 (2001-2002 Reg. Sess.).) However, the history provided by Lopez is not persuasive because it only concerns an amendment to the statute creating liability for people who have "custody and control [of] the animal," in addition to the owners of the animal. Since the ownership versus custody element is not in dispute here, the legislative history for this amendment is of little assistance.

Moreover, there is no need to analyze the legislative history of the statute, because the plain language of the statute is clear. (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1395 [If there is no ambiguity then "there is no need to resort to extrinsic indicia of legislative intent, such as legislative history"].) The gravamen of the offense is set forth in the statute: a vicious dog bites a person. If that act takes place under the conditions of (1) the owner having knowledge of the dog's vicious tendencies, and (2) the owner failing to have confined the animal, then a felony has occurred.

---

[3] Lopez included the legislative history documents in a request for judicial notice. We grant Lopez's request for judicial notice. (Evid. Code, § 452, subd. (c).)

Lopez's argument that the gravamen of the offense is failure to confine a dog, is not persuasive because there is no offense unless a bite occurs. For example, if a vicious dog escapes confinement and runs around a neighborhood while the dog's owner is fully aware of what is happening, the person would not be guilty under section 399 because a bite has not taken place. It is when the dog bites a person that the critical act has occurred. The law then looks to the conditions under which the bite occurred to determine if a crime took place.

Lopez's argument seems to reject any idea that she is responsible for the acts of her dogs, and asserts she can only be liable for her own failure of maintaining the fence. This reasoning is flawed because the plain language of the statute places liability on Lopez for the acts of her dogs. Since the seven bites correspond to a unique dog biting a unique victim there has not been multiple punishments for a single act. Accordingly, the multiple punishment provision of the Double Jeopardy Clause is not applicable.

Lopez asserts the actus reus of section 399 is failure to maintain a fence because the legislative history refers to the offense as one involving criminal negligence. Lopez reasons, "It is the *negligence* of the defendant which is being punished, not the fact the dog escaped, nor the fact the dog bit someone." Assuming Lopez is correct and the actus reus is a negligent act on defendant's part, the reasoning still fails. If a person shoots a gun and a single bullet strikes two people, the shooter could be punished for two offenses. Just because there is a single act does not mean there is a single crime. In this case, Lopez's negligence allowed four dogs to run loose, and those four dogs

19

committed seven unique bites on three victims. Thus, Lopez is responsible for seven offenses.

 E.  CALCRIM NO. 2950

Defendants contend the trial court erred in instructing the jury on the knowledge element of the offense because it changed the element and lessened the prosecution's burden of proof. (CALCRIM No. 2950.) We disagree.[4]

"We review de novo whether jury instructions state the law correctly. [Citation.]" (*People v. Jackson* (2010) 190 Cal.App.4th 918, 923.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In regard to knowledge, section 399, subdivision (b), provides: "If any person owning or having custody or control of a mischievous animal, knowing its propensities, willfully suffers it to go at large . . . ." A "mischievous animal" is a dangerous creature

---

 **4** The People contend defendants forfeited this alleged error by failing to raise it in the trial court. For the sake of perhaps lessening a need for an ineffective assistance of counsel argument, we choose to address the merits of defendants' contention.

that "must be confined lest it injure others." (*Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 460.) The trial court instructed the jury with CALCRIM No. 2950 as follows: "To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant owned or had custody or control of a dangerous animal; [¶] 2. The defendant knew that the animal was dangerous . . . ."

The trial court's instruction is an accurate reflection of the law. The trial court explained the evidence needed to reflect defendants had knowledge of the dog being dangerous. The court omitted the word "propensities"; however, a reasonable juror would understand that in order for the prosecutor to prove dangerousness there must be evidence of the dogs' behavior. It would be difficult to prove "dangerous" in any other manner. Thus, "dangerous behavior" or "dangerous propensities" are implied in the instruction. As a result, we conclude the trial court did not err.

Gonzalez contends the trial court erred because it should have instructed the jury that the crime requires defendants to "have knowledge that the individual behavior of the animal demonstrates viciousness, a reasonable juror could have understood this to mean that [Gonzalez's] knowledge concerning characteristics of the Pit Bull breed in general meant he had actual knowledge that his dogs were dangerous, even if the juror was unconvinced that [Gonzalez] actually knew of his dogs' individual propensity for dangerousness."

We do not find Gonzalez's argument to be persuasive because the purpose of the instruction was to explain what the prosecutor needed to prove. The instruction reflects that the prosecutor needed to prove Gonzalez owned "a dangerous animal" and "knew

21

that the animal was dangerous." The only reasonable interpretation of this instruction is that the animal owned by Gonzalez had to be dangerous—not a breed in general. If the jury were instructed to consider whether the breed were dangerous then the instruction would have read "owned a dangerous breed of animal" or "owned a dangerous type of animal" and "knew the breed was dangerous." However, that is not how this instruction read. The instruction discusses the specific animal owned by Gonzalez. Accordingly, we find Gonzalez's argument to be unpersuasive.

Lopez contends the jury instruction was problematic because it "informed the jury it need only find the owner 'knew that the animal was dangerous.' [Citation.] Which animal? One out of four? All four? The specific dogs which bit a specific child? The mastiff which did not bite anyone?" The only reasonable reading of the instruction is that "the animal" in the instruction corresponds to the dog in the individual count. So, Count 1 involves the dog that bit Princess, Count 2 involves the first dog that bit Hector, Count 3 involves the second dog that bit Hector, and so on. A plain reading of the instruction is clear on this point, as it would be unreasonable to read the instruction as reflecting the prosecutor could prove Lopez owned Dog-A, but Dog-B was dangerous, and Dog-C bit a person.

F.    UNANIMITY

Lopez contends the trial court erred by not instructing the jury on the law of unanimity. Specifically, Lopez asserts the trial court should have *sua sponte* instructed the jury that it could only find defendants guilty of a particular count "if the jury

22

unanimously agreed the defendants had prior knowledge of the dangerousness of a specific dog which bit a specific child who was the subject of that count." We disagree.

"'It is established that some assurance of unanimity is required where the evidence shows that the defendant has committed two or more similar acts, each of which is a separately chargeable offense, but the information charges fewer offenses than the evidence shows. [Citation.] [A unanimity] instruction is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed . . . .'" (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 645.)

The factual basis for the charges in this case are unique: Count 1 involves a dog biting Princess. Count 2 involves one dog biting Hector. Count 3 involves a second dog biting Hector. Counts 4, 5, 6, and 7 concern the four separate dogs each biting Destiny. There is only one possible offense in each count. There is no risk of two acts or similar acts being confused because all the possible acts were charged separately. Accordingly, we conclude the trial court did not err.

Lopez contends the trial court erred because "[h]alf [of] the jurors may have believed [defendants] had reason to know dog A was dangerous, but not dog B. That same half [of] the jurors may have believed dog B was the dog which bit a child, not dog A." As explained *ante*, this argument is not persuasive because, given the instruction, it would be unreasonable to read the instruction related to the offense as reflecting the prosecutor could prove Lopez owned Dog-A, but Dog-B was dangerous, and Dog-C bit a person. Thus, there was not a need for the unanimity instruction.

23

**DISPOSITION**

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

KING _____
Acting P. J.

CODRINGTON _____
J.