Filed 12/26/14  P. v. Cornelio CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063608 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD238691) |
| CARLA RAMIREZ CORNELIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

John L. Dodd & Associates and John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, Steve Taylor Oetting, Tami Falkenstein Hennick, Deputy Attorneys General for Plaintiff and Respondent.

A jury found Carla Ramirez Cornelio guilty of involuntary manslaughter (Pen. Code,[1] § 192, subd. (b); count one) and two counts of owning an animal that kills a human being (§ 399, subd. (a); counts two and three).[2]  The court sentenced Cornelio to four years in local custody:  the four-year upper term for involuntary manslaughter and stayed 16-month lower terms on the remaining counts.  Cornelio appeals.  She contends her convictions are unsupported by substantial evidence; section 399, subdivision (a) preempts section 192, subdivision (b); the court committed errors in instructing the jury and admitting evidence; the court abused its discretion by imposing the four-year upper term for involuntary manslaughter; and cumulative error compels reversal.  We agree section 399, subdivision (a) preempts section 192, subdivision (b).  Cornelio's remaining contentions either lack merit or need not be addressed.

## I.

## BACKGROUND

Cornelio lived with her mother, Alba Cornelio, and other relatives.  Cornelio owned two pit bull dogs, Estrella, who was brown and white, and Estrella's offspring, Paloma, who was white.  Cornelio kept the pit bulls in her back yard.  Alba Cornelio had given her the pit bulls.  Alba Cornelio was the dogs' registered owner, because Cornelio had been a minor when Alba gave her the pit bulls.  Cornelio turned 18 in November 2009.

---

[1]     Further statutory references are to the Penal Code unless otherwise specified.

[2]     Count two concerned a pit bull dog named Estrella and count three concerned a pit bull dog named Paloma.

2

Alba Cornelio was tried with Cornelio and convicted of the same offenses. Alba Cornelio is not a party to this appeal.

A.

*December 2010*

Arturo Lopez lived two houses east of Cornelio. On December 25, 2010, Lopez left his house with his three-month-old poodle, Fluffy. Fluffy was on a leash. After Lopez and Fluffy had walked about 30 or 35 feet from their house, two pit pulls ran toward them from the other side of the street. One of the pit bulls was white and the other was brown and white. The pit bulls were not leashed and their owner was not present. The pit bulls growled and tried to get Fluffy. Lopez tried to pick up Fluffy but was unable to grab him. The pit bulls got to Fluffy. The white pit bull bit Fluffy, injuring Fluffy's mouth so that he was unable to close it. Lopez picked up Fluffy, put him under his coat and started walking home. Lopez walked backward so he could keep an eye on the pit bulls. The pit bulls followed Lopez and jumped into the air 50 to 60 times. At least one of the pit bulls continued to growl. The brown and white pit bull bit Lopez on the leg. Lopez made it back to his house with Fluffy.

Police officers cornered Estrella on Cornelio's front porch. Animal Control Officer Darrell Hanson caught Estrella with a catch pole and impounded her. Lopez identified Estrella as the dog that had bitten him on the leg. Officer Hanson did not impound Paloma because she had returned to Cornelio's back yard, where Officer Hanson found no weak spots in the fence, and because Paloma had not bitten a person. No one was home at Cornelio's house. Hanson posted an impound notice.

3

Lopez took Fluffy to a veterinarian's office, where Fluffy stayed for three days and underwent surgery to repair a broken jaw. Lopez went to a doctor's office where he received rabies shots.

The day after the attack, Lopez went to the home of the pit bulls' owner and told a man what had happened. The man said he would take responsibility for Lopez's expenses. Two or three days later, a male teenager knocked on Lopez's door. Lopez told the teenager that he wanted to speak with the teenager's father. The older man gave Lopez $460.

Estrella was quarantined in the animal shelter from December 26, 2010, to January 4, 2011. She was lame and appeared to have been hit by a car. She had multiple scars. She was unsocialized, and shelter personnel were unable to perform a complete examination because she was aggressive and growled and barked. This was noted on the receipt given to the owner upon Estrella's release. A member of the Cornelio household paid a fee for the release. Cornelio was aware of the payment.

An animal control officer told the Cornelio family to secure their yard. Cornelio learned the pit bulls had left her back yard by the east gate and had attacked Lopez. She believed the pit bulls had killed Fluffy. According to Alba Cornelio, her son attached a piece of plywood to the gate to prevent another escape. The plywood was ten feet high, five or six feet wide and about one inch thick. Cornelio was aware of this repair.

4

B.

*June 2011*

James Mendoza and his wife of 55 years, 75-year-old Emako Mendoza, lived next door and to the west of the Cornelios. A six-foot wooden fence separated the two properties. Mr. Mendoza put a three-foot high piece of wire or chain link above the fence to keep the pit bulls from jumping over and to keep cats out of his yard. A neighbor who lived behind the Cornelios erected a chain link fence, and in the process cut away part of the wooden fence, leaving a gap of about one foot in a corner. According to Mr. Mendoza, the Cornelios propped a heavy piece of wood against the hole, but the wood was not sufficient to keep the pit pulls out of his yard. Because the situation was unsafe, Mr. Mendoza placed a six-foot high piece of chain link fencing at the site of the gap, then put a chain link gate against the fencing and bolted the gate to the fence. For two or three years, Mr. Mendoza's repairs were effective at keeping the pit bulls out of his yard.

Mrs. Mendoza routinely arose around 5:30 a.m., before her husband, and went outside to pick up the newspaper and water her rose garden. On the morning of June 18, 2011, Mr. Mendoza was awakened by the continuous ringing of his doorbell. He wondered why his wife did not answer the door. He heard a commotion and opened the bathroom window. Cornelio and another female neighbor were outside. They said they had to get into the Mendozas' back yard because their dogs were there. Referring to the "heavy fence," Mr. Mendoza replied, "There ain't no way your dogs could be at my house. How did they get through there?" The two neighbors screamed. In less than two

5

minutes, Mr. Mendoza ran to his back yard and opened the side gate so the neighbors could get their dogs. By that time, the dogs had gone into their own yard through the hole in the fence. The neighbors rushed back home.

Mr. Mendoza found his wife lying in her rose garden, with her head on the concrete, saying, "help me, help me." Her left leg and left arm "were just hanging by threads, completely mutilated." A bone in her left arm was protruding through the skin. There was a large gash in her right arm and the arm was dangling. Her right leg was "all chewed up." She was covered in blood.

Mr. Mendoza ran inside and called 911. The 911 operator told Mr. Mendoza to cover his wife with wet towels. Mr. Mendoza went back outside, unlocked his gate and covered his wife.

Meanwhile, before Mr. Mendoza called 911, Alba Cornelio yelled through the slats of the fence then ran into the Mendozas' back yard and saw Mrs. Mendoza. She became hysterical, said something in Spanish then ran home, where she continued to scream through the slats of the fence. She did nothing to help Mrs. Mendoza. Cornelio was in the Mendozas' yard for a short time, if at all.

San Diego Police Officer Christopher Zeltner was a few blocks away when he was summoned to the scene of the attack. He arrived within minutes and asked Mrs. Mendoza what had happened. She said she had been attacked by two dogs, one white and one brown and white, that lived next door. She was in shock and unable to answer further questions. Mr. Mendoza also seemed to be in a state of shock.

6

San Diego Police Officer Eric Cooper arrived after Officer Zeltner. The officers were unable to provide Mrs. Mendoza any medical assistance due to the severity of her injuries and her great loss of tissue and blood. The officers called for paramedics.

Officer Zeltner found a hole in the fence between the Mendozas' and Cornelios' properties. There were wet marks on the fence that appeared to be blood. Officer Zeltner used a wooden beam he found in the Mendozas' yard to block the hole. Another police officer also covered the gap with a tabletop, and for further safety a piece of metal was jammed into the hole from the Mendozas' yard.

Officer Zeltner went next door to the Cornelio residence. In the yard, he saw two dogs meeting Mrs. Mendoza's description. The dogs had what appeared to be blood all over their mouths, faces, chests and heads. Several boards and other objects were leaning against the fence in the Mendozas' back yard in an insecure, rickety fashion. In the back yard were empty food and water bowls and at least one empty dog food bag.

Officer Cooper knocked on the Cornelios' door. Cornelio answered. Officer Cooper asked her where the dogs were. She said they were in the back. Officer Cooper went to the rear of the residence, opened the screen door and saw the dogs. They looked at him, and one of them growled and snarled at him.

The paramedics arrived a few minutes after Officer Zeltner. They put Mrs. Mendoza in an ambulance and took her to the emergency room. Officer Cooper rode in the ambulance with Mrs. Mendoza and attempted to obtain a statement. He was unsuccessful; she screamed throughout the trip to the hospital.

7

Animal Control Officer Mary Ann Hoefert arrived and went into the Mendozas' back yard, where she saw a trampled garden, blood on the bricks and bloody clothes and bits of tissue, resembling fat, on the ground. Drops of what appeared to be blood led toward the corner where the Mendozas' and the Cornelios' properties met and where Mr. Mendoza had bolted the gate to the fence. There, a section of the chain link was bowed away from the metal stake, creating a gap about eight inches wide, large enough for the dogs to squeeze through. There was a dark stain or "rub mark" on the metal at the gap. Officer Hoefert looked over the fence and saw the dogs loose in the Cornelios' yard. They were stained with blood and wore no collars.

San Diego Police Officer Marisela Hernandez was the third police officer to arrive. She went next door to the Cornelios' house. Cornelio answered the door. Officer Hernandez asked Cornelio if she knew why Officer Hernandez was there. Cornelio said yes, because her two dogs had attacked her next door neighbor. Officer Hernandez asked if the dogs were inside. Cornelio said yes. Officer Hernandez asked to go inside and check on them. Cornelio consented. Cornelio led Officer Hernandez through the living room to back door. Cornelio called the dogs. Estrella and Paloma came out of a shed that was inside a fenced enclosure. The enclosure was constructed of irregularly placed wood and mangled chain link fencing. There was a gate in the enclosure and the gate was open. The dogs' faces, necks and torsos were spattered with blood. Paloma was lactating and dripping milk. The dogs stopped 10 or 15 feet from Officer Hernandez. In the yard, Officer Hernandez saw two large, torn empty dog food bags. There was an empty food bowl in the yard and outside of the enclosure.

8

While awaiting animal control officers, Officer Hernandez asked Cornelio who owned the dogs. Cornelio said she did, and she also owned the puppies born to Paloma within the last 15 days. Officer Hernandez asked Cornelio who took care of the dogs. Cornelio said she did.

Officer Hernandez asked Cornelio what had happened that morning. Cornelio said she had awakened early and heard a women screaming and dogs barking. Concerned for her dogs' safety, Cornelio went into the back yard to check on them. She realized the screaming and barking were coming from next door and Paloma and Estrella were the dogs that were barking. Cornelio went to Mr. Mendoza's home, knocked on the door and asked if she could check his yard. He opened the door, said it was not possible for her dogs to get into his yard and closed the door. Cornelio went to the home of another neighbor to see if her dogs were there. The neighbor said they were not. Cornelio returned to her own backyard, put a piece of wood against the fence and looked over the fence into the Mendozas' back yard. Cornelio saw her two dogs in the Mendozas' back yard near Mrs. Mendoza, who was lying on the ground screaming, hurt and bleeding. The dogs were staring at Mrs. Mendoza. Cornelio ran to the Mendozas' door and knocked. When Mr. Mendoza answered, Cornelio said, "My dogs are in the backyard. There's a woman's who's hurt back there. I need to get back there." Mr. Mendoza said he would call 911. Cornelio walked through the Mendozas' house and into their back yard. She stayed a while, then returned to her own house. Cornelio claimed she was the only one in her family who had heard the screams; everyone else was asleep.

9

Officer Hernandez asked Cornelio if she knew how the dogs got out. Cornelio said, "I don't know. They must have climbed out." Officer Hernandez asked, "What do you mean, they climbed out?" Cornelio said, "I don't know. They just get out." Officer Hernandez asked Cornelio if the dogs had any history of getting out. Cornelio said yes, and related the December 2010 incident. Officer Hernandez asked Cornelio if the dogs had bitten anyone else. Officer Hernandez told Cornelio it was likely the pit bulls and the puppies would have to be removed from the house. Cornelio said okay.

Officer Hoefert joined Officer Hernandez at Cornelio's house and asked to speak to Alba Cornelio, the dogs' registered owner, to sign relinquishment papers. Cornelio said her mother was at work cleaning houses. After being instructed to do so, Cornelio said she would call her mother and ask her to come home. Cornelio made a telephone call.

For about 30 or 40 minutes, Officers Hoefert and Hernandez waited for Alba Cornelio to come home. Officer Hoefert asked Cornelio where her mother was. Cornelio said her mother was actually in the house, in a bedroom, and Cornelio had lied to protect her mother, who was feeling ill. Officer Hernandez walked into a bedroom and found Alba Cornelio. Alba Cornelio signed papers allowing the dogs and puppies to be removed and euthanized.[3] Cornelio and two relatives led the dogs from their yard one by one and loaded them into cages in animal control trucks. The dogs were calm because

---

[3] The puppies were not old enough to survive on their own.

10

they knew the relatives.  Officer Hoefert was able to get closer to the dogs once they were in the trucks.  On Estrella's face Officer Hoefert saw bits of fat, the same material that was on the bloody garments and the ground in the Mendozas' back yard.

After the dogs were impounded, Officer Zeltner entered the Cornelios' back yard. He noted the dogs had pushed aside the chain link in the gate that Mr. Mendoza had used to block the gap in the fence between the Mendozas' and the Cornelios' yards, and in so doing had created an eight-inch hole, through which they had entered the Mendozas' yard.  According to Mr. Mendoza, the hole had not been there two or three days before the attack.

After the dogs were removed from Cornelio's back yard, Officer Hernandez inspected the yard.  She saw a blanket in the middle of the yard, with a red, meaty substance on top.  The substance looked like animal intestines.  Officer Hernandez saw a hole in the fence with wood lying nearby.  Along the fence between the Cornelios' and the Mendozas' yards were 10 to 20 piles of feces.  Inside the enclosure, Officer Hernandez saw a bucket of water and an empty food bowl.

There was a second enclosure in the Cornelios' yard, built of new wood and chain link, and attached to the back of the house.  Cornelio said this was an area where Alba Cornelio could have a garden and not be bothered by the dogs.  This enclosure was extremely sturdy.  It consisted of two fences.  The outer fence was eight-to-ten feet tall and made of beams bolted together; the beams were also bolted to boards that were

11

secured to the ground with concrete. The inner fence was six-to-eight feet tall. Officer Cooper tried to shake the fences but was unable to move either one. The only entrance to the enclosure was through the Cornelios' house.

On June 23, 2011, Officer Hoefert returned to Cornelio's house. When Officer Hoefert inquired whether Cornelio had food for the dogs, Cornelio showed Officer Hoefert a covered trash can in the back yard containing quite a bit of dry dog food. Cornelio explained she kept the food in a trash can with a lid because she had a rat problem. Cornelio said she had fed the dogs the night before the attack. Cornelio admitted she had become aware of the hole in the fence about a month before the attack, but believed the dogs would not go through the hole because there was a post there and boards covering it. She believed the dogs had escaped through the hole on the day of the attack.

On June 25, 2011, Officer Cooper saw building materials in the Cornelios' yard that could have been used to construct a structure or a fence or to cover a hole: a roll of chain link fencing six-to-seven feet by more than three feet, plywood, boards, beams, logs and metal rods. On June 29, when Officer Cooper returned to the Cornelios' home, he saw that the gap in the fence had been covered by a large piece of sheet metal.

On June 29, 2011, police officers searched Cornelio's house pursuant to a warrant. In a purse in her bedroom they found her identification and papers related to the December 2010 impounding of Estrella. The papers stated that Estrella had attacked another dog and bitten that dog's owner. When Officer Cooper checked the Cornelios'

12

yard on June 29, he noted there was an eight-to-ten foot piece of plywood securely bolted to the east wall of their house and the fence and covering a side gate through which the dogs had escaped in 2010. Another piece of plywood was leaning against the bolted plywood.

About one week after the attack, Alba Cornelio told Officers Hoefert, Cooper and Hernandez that on the day of the attack, she had had gone with Cornelio to the Mendozas' home. Alba Cornelio said she had comforted Mrs. Mendoza, then felt ill and went home. Alba Cornelio said she told Cornelio to tell the police she was at work. Alba Cornelio said she had not been able to nail anything to the fence to cover the hole because when she had put a table against the fence, Mr. Mendoza had complained that the dogs jumped up on the table.

A veterinary pathologist performed necropsies on Estrella and Paloma. Estrella's necropsy revealed she was well-muscled and well-fed, with dog food and grass in her stomach that she had ingested approximately three-to-four hours, or a little longer, before being euthanized. Paloma's necropsy showed she was undernourished, with opossum parts in her stomach that she had eaten three-to-four hours before being euthanized. The veterinarian who performed Paloma's necropsy rated Paloma's body condition at three on a scale of nine, with five and six representing optimal condition and one and two representing starvation. There was evidence Paloma had eaten another mammal in addition to the opossum. As a lactating female, Paloma would have needed up to eight-

13

to-eleven times the nutrition of a normal dog her size. It appeared Paloma had fed herself exclusively by hunting, at least for the last two days of her life. The veterinarian found no evidence of human tissue inside either pit bull.

In her 32 years as an animal control officer, Officer Hoefert had never seen anything as horrific as Mrs. Mendoza's injuries. Animal Control Officer Hanson, who was also at the scene, testified this was the first time in his 23-year career he had dealt with a dog bite that had killed a person. Officer Zeltner said the attack on Mrs. Mendoza was the worst thing he had ever seen. Officer Cooper testified he had never seen such severe injuries.

Mrs. Mendoza required a breathing tube and suffered a heart attack as a result of her injuries. In his 18 years as an orthopedic trauma surgeon, Michael Bongiovanni had never before seen such extensive trauma. Mrs. Mendoza suffered well over 50 dog bites and multiple lacerations inflicted in a repetitive or ongoing process. The injuries were caused by tearing, shearing and ripping with "an unbelievably high amount of force" " and "a horrendous amount of energy." She suffered injuries to bones and severed nerves and arteries. Dirt from the scene of the attack was embedded in the wounds.

In the six months after the attack, Mrs. Mendoza underwent about eight surgeries. She was in constant pain. Surgeons removed all of her devitalized tissue. Dr. Bongiovanni amputated her left leg below the knee and her left arm below the elbow. Mrs. Mendoza suffered a severe infection, which then required amputation of her left leg above the knee and her left arm above the elbow. Dr. Bongiovanni tried to save Mrs. Mendoza's right leg with grafts and plastic surgery and was able to save her right arm.

14

Mrs. Mendoza was unable to speak for three weeks after the attack and was never able to return home. After her release from the hospital, she lived in a rehabilitation facility. In December 2011, a severe infection necessitated amputation of Mrs. Mendoza's right leg close to the hip. Having lost both of her legs above the knee and her left arm above the elbow, Mrs. Mendoza became depressed. Her kidneys failed, she caught pneumonia and she suffered two more heart attacks. On December 24, 2011, Mrs. Mendoza died in the hospital.

## II.

## PREEMPTION

Cornelio contends section 399, subdivision (a) (owning an animal that kills a human being) preempts section 192, subdivision (b) (involuntary manslaughter) because section 399 is more specific than section 192; both require the defendant to have acted with gross negligence; and a violation of section 399 will, at least commonly, result in a violation of section 192, subdivision (b).

"Under the *Williamson* rule [*In re Williamson* (1954) 43 Cal.2d 651, 654], if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86.) "Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or

15

commonly result in a violation of the general statute.' [Citation.]  In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute."  (*People v. Murphy*, *supra*, at p. 86.)  There is a strong presumption against preemption.  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1099.)   The party who asserts preemption bears the burden of demonstrating preemption.  (*Id.* at p. 1088.)  In determining whether one code section preempts another, "we must interpret both pieces of legislation.  '[T]he construction of statutes and the ascertainment of legislative intent are purely questions of law.' "  (*Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 392.)

As relevant here, section 399, subdivision (a) states:  "If any person owning or having custody or control of a mischievous animal, knowing its propensities, . . . keeps it without ordinary care, and the animal, . . . while not kept with ordinary care, kills any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony."  Section 192, subdivision (b) proscribes "the unlawful killing of a human being without malice . . . in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  The People prosecuted the involuntary

16

manslaughter count on the dual theories that Cornelio (1) committed the unlawful acts of violating section 399, subdivision (a) and two county Ordinances[4] and (2) committed the lawful act of owning dogs.  Clearly, section 399, subdivision (a), as relevant here, is more specific than section 192, subdivision (b).

A violation of section 399, subdivision (a) by keeping an animal "without ordinary care" will commonly constitute involuntary manslaughter by "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  In that instance, both sections require the defendant to have acted with gross negligence.  "Involuntary manslaughter contemplates 'negligent acts which are aggravated, reckless and gross and which are such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life [or] danger to human life or to constitute indifference to the consequences of such acts . . . .' " (*Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 454.)  Section 399, subdivision (a) " 'requires . . . proof of "aggravated, culpable, gross, or reckless conduct, which is such a departure from the conduct of an ordinarily prudent person under the same circumstances as to demonstrate an indifference to consequences or a disregard of human life." [Citation.]  . . . .' (*People*

---

4      The ordinances are County of San Diego, Code of Regulatory Ordinances, sections 62.669(a) and 62.669.1(a).  The former section states:  "A dog's owner or custodian or a person who has control of a dog shall prevent the dog from being at large . . . ."  The latter section states:  "A dog's owner or custodian or other person having control of a dog shall exercise ordinary care to prevent the dog, while the dog is under the owner, custodian or other person's care, custody or control from . . .  [a]ttacking, biting or otherwise causing injury to any person engaged in a lawful act."

17

*v. Medlin* (2009) 178 Cal.App.4th 1092, 1103 [(*Medlin*)]; see § 7, subd. (2).)"[5]  (*People v. Flores* (2013) 216 Cal.App.4th 251, 259 (*Flores*).)

It is self-evident that a violation of section 399, subdivision (a) by keeping a mischievous dog with criminal negligence will commonly constitute a violation of section 192, subdivision (b) by the commission of the lawful act of keeping the dog, with criminal negligence.  Thus, section 399, subdivision (a) preempts section 192, subdivision (b), and Cornelio's conviction under the latter section must be reversed.

III.

SECTION 399, SUBDIVISION (A)

A.

*Substantial Evidence*

Cornelio contends her two convictions of violating section 399, subdivision (a) are unsupported by substantial evidence because there was no evidence she acted with

---

[5]    In *Medlin*, *supra*, 178 Cal.App.4th at page 1092, cited in *Flores*, *supra*, 216 Cal.App.4th at page 259, the People appealed after the defendants were found factually innocent of dependent adult abuse likely to produce great bodily injury or death (§ 368, subd. (b)(1)).  (*Medlin*, *supra*, at p. 1094.)  "Violation of section 368, subdivision (b)(1) requires proof of willful conduct that caused a dependent adult to suffer under circumstances likely to produce great bodily harm or death."  (*Medlin*, *supra*, at p. 1102.)  After stating that section 368, subdivision (b)(1) required "criminal negligence," the *Medlin* court defined that negligence as set forth above in the quotation in *Flores*.

   *Flores* also cited section 7, subdivision (2), which states:  "The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context:  . . .  [¶]  . . .  The words 'neglect,' 'negligence,' 'negligent,' and 'negligently' import a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestows in acting in his own concerns."  (*Flores*, *supra*, 216 Cal.App.4th at p. 259.)

18

criminal negligence in keeping the pit bulls.[6] She argues she and her family took precautions to ensure the dogs stayed in the yard that were objectively and subjectively reasonable.[7]

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the

[6]    In light of our conclusion that section 399, subdivision (a) preempts section 192, subdivision (b), we need not address Cornelio's contentions that her conviction under the latter section is unsupported by substantial evidence; the court erred in its instructions concerning involuntary manslaughter; and the court abused its discretion in imposing the four-year upper term for involuntary manslaughter. As there was only one error requiring reversal, we need not discuss Cornelio's contention that cumulative errors require reversal.

[7]    Specifically, Cornelio argues she believed the fence was secure; after the neighbor left the gap in the fence, Mr. Mendoza and the Cornelios closed it and that remedy had been effective for two years; there was no evidence the pit bulls were uncontrollable or had escaped after the December 2010 incident; and after that incident, the Cornelio family securely blocked the point of escape with plywood. These arguments are, in essence, a request that we reweigh the evidence.

Cornelio also argues that Officer Hoefert's testimony that Cornelio told her that she had become aware of the hole in the fence about a month earlier was inconsistent with Mr. Mendoza's testimony that the hole had not been there two or three days earlier, and while Mr. Mendoza said the hole was about eight inches wide, Officer Hoefert did not say whether Cornelio specified the size of the hole. Cornelio's knowledge is all that matters; Mr. Mendoza's knowledge is irrelevant.

Citing her own statements in the June 19, 2011, interview by Officer Hoefert, Cornelio claims she had been in Florida, where she had graduated from a nursing assistant program and visited family; she had returned to San Diego a week earlier; and she therefore would not have been able to build another fence. In the interview, Cornelio did not say when she went to Florida or how much time she spent there. Her statements during the interview do not support the claim in her brief that she "had spent considerable time" there. In any case, being away from home would not relieve her of her legal duty under section 399, subdivision (a).

19

evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.] [¶] ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

Section 399, subdivision (a) states: "If any person owning or having custody or control of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and the animal, while so at large, or while not kept with ordinary care, kills any human being who has taken all the precautions that the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony." " 'The basic purpose of section 399 is to protect people against fatal attacks by "mischievous animals," where the victim is in no way at fault for the attack. [Citation.] It does so by punishing those who know their animals are "mischievous" but allow them to run free or keep them in a negligent manner.' [Citation.] Section 399, '[i]n seeking to protect people from fatal attacks by "mischievous" animals, . . . implies that a "mischievous" animal is one that may be dangerous to others if allowed to run free or kept in a negligent manner. Knowledge of an animal's "mischievous propensities" therefore puts an owner on notice of such danger or risk of

20

harm, and his or her liability under the statute arises from the failure to act reasonably with knowledge of this risk. Consequently, . . . "mischievous propensities" as used in the statute means those propensities that may naturally pose a risk of harm or injury to others.' " (*Flores*, *supra*, 216 Cal.App.4th at p. 259.)

Here, the court instructed the jury: "To prove that the defendant is guilty of [violating section 399, subdivision (a)], the People must prove that: [¶] 1. The defendant owned or had custody or control of a dangerous animal; [¶] 2. The defendant knew that the animal was dangerous; [¶] 3. The defendant failed to use ordinary care in keeping the animal; [¶] 4. The animal killed Emako Mendoza while the defendant failed to use ordinary care in keeping it . . . ." (CALCRIM No. 2950.)[8] The court further instructed: "Using *ordinary care* means using reasonable care to prevent reasonably foreseeable harm to someone else. A person fails to use ordinary care if she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." (CALCRIM No. 2950.)

The definition of "ordinary care" in CALCRIM No. 2950 is a statement that section 399 requires criminal negligence. (*Flores*, *supra*, 216 Cal.App.4th at p. 259.) " 'Criminal negligence requires a gross violation of an existing duty of care. [Citations.] There must be proof of "aggravated, culpable, gross, or reckless conduct, which is such a

---

8       The court did not instruct the jury on the statutory alternative to "keep[ing Estrella and Paloma] without ordinary care," i.e., "willfully suffer[ing them] to go at large." (§ 399, subd. (a).)

departure from the conduct of an ordinarily prudent person under the same circumstances as to demonstrate an indifference to consequences or a disregard of human life." [Citation.] The question is "whether a reasonable person in the defendant's position would have appreciated the risk his or her conduct posed to human life." [Citation.] The defendant's subjective awareness is irrelevant.' " (*Flores*, *supra*, 216 Cal.App.4th at p. 259.)

"Section 20 provides, 'In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.' " (*People v. Valdez* (2002) 27 Cal.4th 778, 782.) " 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' " (*People v. Linwood* (2003) 105 Cal.App.4th 59, 71, quoting *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574.) "We realize that the ' "reasonably should have known" formulation departs somewhat from the usual description of criminal negligence.' [Citation.] . . . 'Criminal negligence . . . is a standard for determining when an act may be punished under the penal law because it is such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances.' " (*People v. Linwood*, *supra*, at pp. 71-72.)

Here, there is substantial evidence of criminal negligence. Cornelio, who owned and cared for Estrella and Paloma, knew they had a history of escaping from her back yard. She knew that about six months earlier, in December 2010, they had escaped and attacked Lopez, and believed the pit bulls had killed Lopez's puppy. Estrella behaved

22

aggressively while impounded after that attack; this was noted on the receipt that accompanied Estrella upon her release; and papers relating to the impound were later found in Cornelio's purse. Cornelio knew a member of her family had taken steps to close the pit bulls' December 2010 escape route. About a month before the June 2011 attack on Mrs. Mendoza, Cornelio learned of another potential escape route, a hole in the fence, but believed the pit bulls would not escape by that route because the hole was blocked by a post and boards. Shortly after the attack, Cornelio changed her mind; she acknowledged that the pit bulls had escaped through the hole to attack Mrs. Mendoza. Additionally, although Cornelio was responsible for feeding Paloma, Paloma was undernourished, and a couple of days before the attack, was relying exclusively on hunting mammals such as opossum to feed herself.

Any effort Cornelio made to keep the pit bulls in her yard paled in comparison to the effort exerted to protect the Cornelio family from the pit bulls. In contrast to the post and boards placed against the hole in the fence, the double-fenced enclosure attached to the back of the house, whose purpose, according to Cornelio, was to prevent the pit bulls from bothering Alba Cornelio, was extremely sturdy and secure.

As substantial evidence supports the conclusion Cornelio acted with criminal negligence in keeping the pit bulls, we need not address Cornelio's contention that CALCRIM No. 2950 is fatally defective because it permitted the jury to find her guilty of violating section 399, subdivision (a) based on a finding of ordinary, rather than criminal, negligence, in violation of her constitutional rights.

23

B.

*Multiple Violations of Section 399, Subdivision (a)*

Cornelio contends because there was only one negligent act, failing to secure the fence, there was substantial evidence of only one violation of section 399, subdivision (a).

Cornelio was convicted not because she simply failed to maintain the fence, but because she failed to take adequate measures to restrain the pit bulls. Such measures might have included confining both pit bulls to one of the two enclosures within the yard, tethering them or placing them in a kennel; or by using two different methods of restraint, one for each dog. The fact that Cornelio chose to rely on the fence as the sole method of containment for both pit bulls does not mean she committed only one offense. As discussed above, she was on notice the fence was not sound and she was therefore required to secure each of the two dogs by other means. She failed to secure either dog and thus committed two violations of section 399, subdivision (a).

C.

*Duty to Repair or Maintain the Fence*
*And The Civil Code Section 841 Instruction*

Alba Cornelio's counsel asked the court to instruct the jury pursuant to Civil Code section 841. Cornelio's counsel did not object. Civil Code section 841, subdivision (a) states: "Adjoining landowners shall share equally in the responsibility for maintaining the boundaries and monuments between them." The court instructed the jury:

24

"Coterminous owners are mutually bound equally to maintain: [¶] 1. The boundaries and monuments between them; [¶] 2. The fences between them[.] [¶] *Coterminous* means linked or having the same boundaries."

Cornelio contends there was no substantial evidence she had a duty to repair or maintain the fence because the Cornelios did not own the property where they lived; Alba Cornelio was the tenant, not Cornelio; and there was no evidence Cornelio had any legal right to control the premises. Cornelio concludes the above instruction was unconstitutional. She also argues that giving the instruction was error because Civil Code section 841 concerns who is to pay for a fence and does not impose a duty to construct a fence.

Cornelio misses the point. As noted above, her duty was not simply to maintain the fence; she was required to prevent the pit bulls from killing Mrs. Mendoza. This could have been accomplished by various means, such as confining the pit bulls to an enclosure within the yard. Because Cornelio chose to allow the pit bulls to run freely in the yard, she was required to ensure the fence was secure enough to contain them, regardless of whether she would have had a duty to maintain the fence if she had not owned the pit bulls. In any case, the instruction may have benefited Cornelio by pointing out that Mrs. Mendoza had a duty to maintain the fence, which the jury might have considered to be one of "the precautions that the circumstances permitted" (§ 399, subd. (a)), a requirement for a conviction.

The court also instructed the jury that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give

25

a particular instruction that I am suggesting anything about the facts." According to the terms of the Civil Code section 841 instruction, if the jury found Cornelio was not a landowner, it would not have found she had a duty to maintain the fence. In that case, the instruction would have been merely irrelevant.

There was no error.

## IV.

## VIOLATION OF COUNTY ORDINANCES
## AS LESSER INCLUDED OFFENSES

Cornelio contends the court committed prejudicial error by failing to instruct on the lesser included offenses set forth in County of San Diego, Code of Regulatory Ordinances, sections 62.669(a) and 62.669.1(a). The former section states: "A dog's owner or custodian or a person who has control of a dog shall prevent the dog from being at large . . . ." The latter section states: "A dog's owner or custodian or other person having control of a dog shall exercise ordinary care to prevent the dog, while the dog is under the owner, custodian or other person's care, custody or control from . . . [a]ttacking, biting or otherwise causing injury to any person engaged in a lawful act."

" '[A] trial court is not required to instruct the jury as to all lesser included offenses, only those that "find substantial support in the evidence." [Citation.] In this context, substantial evidence is evidence from which reasonable jurors could conclude " 'that the lesser offense, but not the greater, was committed.' " ' " (*People v. Elmore* (2014) 59 C4th 121, 153.)

26

As Cornelio concedes in her reply brief, the ordinances here are not lesser included offenses of section 399, subdivision (a) because the ordinances contain an element not contained in section 399, subdivision (a): conduct committed only in the County of San Diego. (*People v. Moore* (1983) 143 Cal.App.3d 1059, 1067.)

## V.

## ADMISSION OF EVIDENCE

## A.

### *Photographs*

On the first day of trial, the prosecutor sought to introduce into evidence seven photographs of Mrs. Mendoza's injuries and one autopsy photograph. The prosecutor argued the photographs taken at the crime scene would accompany Dr. Bongiovanni's testimony; assist the jury in understanding the nature and extent of the injuries and the necessary amputations, other surgeries and treatments Mrs. Mendoza underwent in the six months before her death; and would show how dangerous the dogs were. The autopsy photograph would assist the jury in understanding the testimony of the medical examiner and show the ultimate state of Mrs. Mendoza's body. Cornelio moved in limine to exclude the photographs, arguing they were cumulative, irrelevant and so gruesome as to be more prejudicial than probative pursuant to Evidence Code section 352. The court stated it was inclined to admit some of the photographs, but deferred making a ruling until the next day. The next day, the court did not address the issue. Several days later, the prosecutor moved to introduce the photographs into evidence. The court asked

27

defense counsel if she objected. Counsel said no. The court admitted the photographs.

Respondent argues that Cornelio has forfeited her right to object to the admission of the photographs by failing to secure a final ruling. We disagree. "[T]he court's failure to rule formally, after having reserved the ruling, constitute[s] an implied ruling against the objection and in favor of admissibility." (*People v. Flores* (1979) 92 Cal.App.3d 461, 466.)

On the merits, Cornelio now contends the photographs were irrelevant to any disputed issue because she offered to stipulate that the dogs had attacked Mrs. Mendoza, resulting in her death; witnesses testified about the results of the attack; and Cornelio "did not really even contest the . . . 'mischievous' element of the statute" or the pit bulls' "dangerous propensities." Cornelio argues because she did not personally cause the injuries, the photographs were not relevant to show intent, and there was no similarly horrific incident that had occurred previously and of which she was aware. She claims because the photographs were not relevant, they constituted inadmissible evidence of the impact on the victims, the Mendoza family. She asserts that even if the photographs were relevant, they were more prejudicial than probative and should have been excluded pursuant to Evidence Code section 352, and admission of the photographs rendered the trial fundamentally unfair.

" 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless

28

the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1247-1248.) Here, there was no abuse of discretion.

The photographs depicting the extent of Mrs. Mendoza's injuries were relevant. Although Cornelio conceded the dog bites caused Mrs. Mendoza's death, in closing argument Cornelio's attorney minimized the pit bulls' dangerousness. The photographs were relevant to show the pit bulls were "mischievous" within the meaning of section 399, subdivision (a). Although there was testimony concerning the results of the attack, the photographs illustrated those results in a way that words could not and brought the testimony to life. "The defense's offer to stipulate . . . did not negate the relevance of the photograph. 'The prosecutor " 'was not obliged to prove these details solely from the testimony of live witnesses' [citation] or to accept antiseptic stipulations in lieu of photographic evidence. '[T]he jury was entitled to see how the physical details of the scene and the bod[ies] supported the prosecution theory . . . .' " [Citation.]' (*People v. Crittenden* [1994] 9 Cal.4th [83,] 133; see also *Old Chief v. United States* (1997) 519 U.S. [172, 187], . . . [Conventional evidence, as contrasted with a stipulation, 'tells a colorful story with descriptive richness . . . . This persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them.']; *People v. Fierro* (1991) 1 Cal.4th 173, 222-223 . . . , and cases cited therein; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007 . . . ['The general rule is that the prosecution in a criminal case cannot be compelled to accept a stipulation if the effect

29

would be to deprive the state's case of its persuasiveness and forcefulness.'].)" (*People v. Scheid* (1997) 16 Cal.4th 1, 16-17.) Here, the autopsy photograph, depicting Mrs. Mendoza after the amputations, was relevant to show the extreme medical measures required in the attempt to preserve her life. The court did not abuse its discretion by concluding that although the photographs depicting the trauma inflicted on Mrs. Mendoza "are as bad as they get," the photographs' probative qualities outweighed any possible prejudice. Admission of the photographs was not erroneous.

## B.

### *Evidence That Estrella Had Harmed Her Puppies*

Alba Cornelio made an out of court statement that Estrella did not want to nurse Paloma and her litter mates and nipped at them; Alba saw bite marks on the puppies' heads; and the next day the puppies were dead. After the third puppy died, Alba Cornelio took care of the fourth puppy, Paloma. According to Cornelio's counsel, this happened either three or six years before the events at issue here. Cornelio's counsel moved in limine to exclude evidence Estrella had killed her puppies.[9] The court granted the motion, but said it was "willing to revisit it," "[i]f need be," "[b]ased upon the testimony, of the evidence as it comes in."

Later, the prosecutor asked the court to reconsider its ruling. Cornelio's counsel

---

[9]    Cornelio does not point to any evidence that Estrella had killed her puppies aside from Alba Cornelio's statement.

objected. The court concluded it would allow the evidence "as long as it's limited to . . . this is what [Alba Cornelio] told me." The court stated it would think about what latitude to give the parties in arguing this evidence.

On direct examination, Hernandez testified that on June 25, 2013, Alba Cornelio told her the following: "[Alba Cornelio] started noticing that Estrella didn't want to nurse the puppies and that she would nip at the puppies. And as [Alba] would go out and feed them and watch over them and take care of them, she started noticing that the puppies were, in fact dying. [¶] And when she went outside and saw the puppies, she would notice bite marks on their head. And about a day later, the dogs would be dead; the puppies would be dead. She also told me that after three of them had died, she took the last puppy, took it inside the house and fed it and nursed it herself, and that dog was later Paloma." Hernandez was not cross-examined about this statement. In closing argument, the prosecutor referred to the statement and said, "You have to think about what you know about a dog who literally kills its puppies, what kind of notice that put Alba Cornelio on. About the dog that she kept and the puppy that came from that aggressive dog. Just one little thing starting very early in time, giving . . . some indication about what these dog owners are about." Defense counsel did not object to his argument.

Alba Cornelio, not Cornelio, made the statement at issue, and the court expressly instructed the jury: "You have heard evidence that both defendants made a statement out of court. You may consider that evidence only against the defendant who made the statement, not against any other defendant." (CALCRIM No. 305.) We presume the jury followed this instruction. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

31

Cornelio contends the court did not exercise informed discretion because it was confused about which litter was the subject of this evidence. During the discussion that ensued when the prosecutor asked the court to reconsider its ruling, the prosecutor, followed by Cornelio's counsel, also referred to Alba Cornelio's relinquishment of the litter in existence at the time of the attack on Mrs. Mendoza. There is no indication the court was confused about the two litters.

There was no error.

DISPOSITION

The conviction of involuntary manslaughter (Pen. Code, § 192, subd. (b); count one) is reversed. The matter is remanded for resentencing. In all other respects, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.

32